J-S10027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| COLE JAMES CAMPBELL | : | |
| | : | |
| Appellant | : | No. 480 MDA 2024 |

Appeal from the Judgment of Sentence Entered January 4, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s):  CP-31-CR-0000187-2022

BEFORE:  BOWES, J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 09, 2025**

Appellant, Cole James Campbell, appeals from the judgment of sentence entered January 4, 2024, as made final by the denial of his post-sentence motion on March 27, 2024.  We affirm.

The trial court summarized the relevant facts and procedural history of this case as follows.

> On the evening of April 3, 2022, Timothy Skipper and his wife, Hillary Skipper, were unloading groceries from Mrs. Skipper[']s vehicle in the driveway of their home located [on] Springhill Drive in Clay Township, Huntingdon County[, Pennsylvania]. Springhill Drive is a private, dead-end dirt road that was constructed in the early 1970s to access the houses located along it, with the houses forming an informal neighborhood. The Skippers were new to the neighborhood, having bought their home a little over a year prior.  For them, the purchase of their home was a symbol of their success in turning their lives around. Both were former drug addicts who had also been involved in selling drugs, and both had criminal convictions for drug offenses. But both of them had been able to get clean, and, after completing their respective sentences, obtain good

employment. Most significantly, they had been able to build a better life for their two boys, then approximately ages nine and [13], who were playing out in the yard.

As they were unloading the groceries they saw one of their neighbors, [Appellant], drive past their home headed toward the main road. He was speeding. This was an ongoing issue that the Skippers had tried to address with him, particularly in light of the amount of time their boys spent outside playing. Their efforts only seemed to encourage the behavior. It had also led to a larger dispute in the neighborhood regarding the use and maintenance of the road. [Appellant] and his wife were on one side of that dispute, and a group of neighbors that included the Skippers was on the other.

A few minutes after [Appellant] first drove past, the Skippers saw him come back up the road, headed toward his home at the top of the hill. He was speeding again. Mr. Skipper expressed to his wife that he had had enough of the situation, and he was going to go up to the Campbell residence and tell [Appellant] that he was going to put speed bumps on the road. He got into his pickup truck and headed up Springhill Drive. It was the last time Mrs. Skipper saw her husband alive. Minutes later he was dead, having been shot three times by [Appellant] with an AR-15 style rifle after a brief argument between the two men regarding the road and the speeding issue.

[Appellant's] wife, Brandy Campbell, placed a call to 911 just after the shots were fired. [Appellant] was very cooperative with the Pennsylvania State Police Troopers who responded to the call. He claimed to have shot and killed Mr. Skipper in self-defense. The entirety of the incident at [Appellant's] residence was captured on video by camera systems that [Appellant] maintained, and he showed the videos captured by those systems to the state troopers in support of his claim. The Commonwealth, however, viewed the situation quite differently. [Appellant] was brought to trial in October 2023 on a number of criminal charges arising from the incident, including, most significantly, first- degree murder. On the basis of the video and other significant evidence the jury convicted [Appellant] of [Count one, voluntary manslaughter, Count two,

- 2 -

aggravated assault – serious bodily injury, and Count three, aggravated assault with a deadly weapon.[1]]

[The trial court sentenced Appellant on January 4, 2024]. At sentencing[,] the [trial c]ourt first found that Count [three], the second aggravated assault, merged with Count [one], voluntary manslaughter. The [trial c]ourt then sentenced [Appellant] to serve a term of [seven] to 20 years' incarceration on Count [two, aggravated assault – serious bodily injury], and a term of 10 to 20 years' incarceration on Count [one, voluntary manslaughter]. The sentences were imposed consecutively, resulting in a global sentence of 17 to 40 years' incarceration.

Trial Court Opinion, 6/24/24, at 1-3 (footnotes added). This timely appeal followed.

Appellant raises the following issues for our consideration.

1. Whether the [trial] court erred, as a matter of law, when it failed to merge the imposed sentenced for count [one], the offense of voluntary manslaughter, and count [two], the offense of aggravated assault attempting to cause or causing serious bodily injury?

2. Whether the [trial] court abused its discretion when it sentenced Appellant to an aggravated term of imprisonment of 17 [] to 40 years[' incarceration], imposed consecutively and outside the aggravated ranges, without adequate basis for such departures, and doing so while fixating on the gravity of the offenses and ignoring other factors, resulting in an unreasonable sentence?

3. Whether the trial court abused its discretion when it denied Appellant's motion for new trial based on the weight of the evidence, insomuch as the verdicts were so contrary to the evidence as to shock the sense of justice and so that the right may be given another opportunity to prevail?

4. Whether the trial court erred as a matter of law when it failed to grant Appellant's motion for judgment of acquittal when it found that the Commonwealth met its burden of proof, hence

_____

[1] 18 Pa.C.S.A. §§ 2503(b), 2702(a)(1), and 2702(a)(4), respectively.

- 3 -

> finding sufficient evidence, of disproving Appellant's claim of self-defense?

Appellant's Brief at 8 (unnecessary capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable George N. Zanic. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in President Judge Zanic's June 24, 2024 opinion. Therefore, with respect to the issues that Appellant raised and briefed on appeal,[2] we affirm on the basis of President Judge Zanic's able opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of President Judge Zanic's June 24, 2024 opinion.

Judgment of sentence affirmed.

_____

[2] Appellant included nine issues in his statement of errors complained of on appeal filed pursuant to Pa.R.A.P. 1925(b), one in which Appellant argued that the trial court erred in admitting certain photographs, and four that address issues of suppression. *See* Appellant's Rule 1925(b) Statement, 4/25/24, at 6-8. The trial court addressed each of these issues in its 1925(a) opinion. *See* Trial Court Opinion, 6/24/24, at 75-77. Appellant, however, did not raise any of these claims on appeal and, as such, failed to preserve these issues for our consideration. *See* Appellant's Brief; *see also **Commonwealth v. Sipps***, 225 A.3d 1110, 1112 n.2 (Pa. Super. 2019) (issues raised in a Rule 1925(b) statement which are not raised and developed in the appellate brief are waived).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>06/09/2025</u>

**IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   :             CP-31-CR-187-2022

                                            :

VS.                                        :

                                              :

COLE JAMES CAMPBELL                :

FILED 2024 JUN 14 PM 12: 12

## OPINION IN SUPPORT OF ORDER
## PURSUANT TO Pa.R.A.P. 1925(a)

On the evening of April 3, 2022, Timothy Skipper and his wife, Hillary Skipper, were unloading groceries from Mrs. Skipper's vehicle in the driveway of their home located at 21414 Springhill Drive in Clay Township, Huntingdon County. Springhill Drive is a private, dead-end dirt road that was constructed in the early 1970s to access the houses located along it, with the houses forming an informal neighborhood. The Skippers were new to the neighborhood, having bought their home a little over a year prior. For them, the purchase of their home was a symbol of their success in turning their lives around. Both were former drug addicts who had also been involved in selling drugs, and both had criminal convictions for drug offenses. But both of them had been able to get clean, and, after completing their respective sentences, obtain good employment. Most significantly, they had been able to build a better life for their two boys, then approximately ages nine and thirteen, who were playing out in the yard.

As they were unloading the groceries they saw one of their neighbors, defendant Cole Campbell, drive past their home headed toward the main road. He was speeding. This was an ongoing issue that the Skippers had tried to address with him, particularly in light of the amount of time their boys spent outside playing. Their efforts only seemed to encourage the behavior. It had also led to a larger dispute in the neighborhood regarding the use and maintenance of the road. Defendant and his wife were on one side of that dispute, and a group of neighbors that included the Skippers was on the other.

A few minutes after Defendant first drove past, the Skippers saw him come back up the road, headed toward his home at the top of the hill. He was speeding again. Mr. Skipper expressed to his wife that he had had enough of the situation, and he was going to go up to the Campbell residence and tell Defendant that he was going to put speed bumps on the road. He got into his pickup truck and headed up Springhill Drive. It was the last time Mrs. Skipper saw her husband alive. Minutes later he was dead, having been shot three times by Defendant with an AR-15 style rifle after a brief argument between the two men regarding the road and the speeding issue.

Defendant's wife, Brandy Campbell, placed a call to 911 just after the shots were fired. Defendant was very cooperative with the Pennsylvania State Police Troopers who responded to the call. He claimed to have shot and killed Mr. Skipper in self-defense. The entirety of the incident at Defendant's residence was captured on video by camera systems that Defendant maintained, and he showed the videos captured by those systems to the state troopers in support of his claim. The Commonwealth, however, viewed the situation quite differently. Defendant was brought to trial in October 2023 on a number of criminal charges arising from the incident, including, most significantly, first-degree murder. On the basis of the video and other significant evidence the jury convicted Defendant of the following:

**Count 1 –** Voluntary manslaughter, unreasonable belief killing justifiable, as a lesser-included offense to the charge of first-degree murder [18 Pa. C.S. § 2503(b)];

**Count 2 –** Aggravated assault, causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life [18 Pa. C.S. § 2702(a)(1); and

**Count 3 –** Aggravated assault, intentionally or knowingly causes bodily injury to another with a deadly weapon [18 Pa. C.S. § 2702(a)(4).

2

At sentencing the Court first found that Count 3, the second aggravated assault, merged with Count 1, voluntary manslaughter. The Court then sentenced Defendant to serve a term of 7 to 20 years' incarceration on Count 2, and a term of 10 to 20 years' incarceration on Count 1. The sentences were imposed consecutively, resulting in a global sentence of 17 to 40 years' incarceration.

Defendant now appeals, raising a number of issues with respect to the sentences imposed, this Court's pretrial rulings, and the evidence admitted at trial, along with continuing his argument that his killing of the victim, Mr. Skipper, was entirely justified. For the reasons set forth herein the issues raised by Defendant do not merit relief, and the order of sentence should be affirmed.

## I. PROCEDURAL HISTORY

As noted above, the crimes for which Defendant was convicted occurred on April 3, 2022. The criminal complaint against him was filed on April 29, 2022. The matter was the subject of much pretrial motion practice. Most significantly, both Defendant and the Commonwealth filed motions on August 8, 2022, that sought rulings that would effectively decide the case in their favor. Defendant's took the form of his extensive omnibus pre-trial motion, which sought, in pertinent part: (i) a *habeas corpus* ruling that the Commonwealth had failed to establish a *prima facie* case on the grounds that Defendant was acting in self-defense; and (ii) suppression of nearly the entirety of the evidence that the Commonwealth had obtained against Defendant. The Commonwealth sought an order barring Defendant from arguing or otherwise raising a claim of self-defense at trial. After careful review of the video of the shooting, the additional written legal argument submitted by both sides, and the applicable law, the Court denied each of these motions in an order entered December 20, 2022. After further motion practice regarding various evidentiary and jury selection matters, Defendant was brought to trial the week of October 16–20, 2023. Jury selection occurred on October 16th, the evidence was presented on October 17th, 18th, and 19th, and closing arguments and deliberations occurred on the 20th.

3

Sentencing occurred on January 4, 2024. Both sides submitted sentencing memorandums, and the Court reviewed these along with the presentence investigation report. The Court also received character statements from Defendant's acquaintances and impact statements from the victim's family members at the sentencing hearing.

Defendant filed post-sentence motions on January 16, 2024, and supplemental post-sentence motions (filed with leave from the Court) on March 21, 2024. The post-sentence motions were denied by this Court by order entered March 27, 2024, resulting in this appeal.

## II. ISSUES RAISED

Defendant's statement of matters complained of on appeal ostensibly raises nine issues. Those nine issues are complexly, but also broadly, stated in a multipart fashion over the course of eight pages. Thus, the Court will not repeat them verbatim here. The Court further notes that Defendant's Issue No. 3, which ostensibly pertains only to Defendant's post-sentence motion for acquittal, also incorporates, in a rather convoluted fashion, a challenge to the denial of Defendant's post-sentence motion in arrest of judgment despite not specifically identifying such motion.

Stated more succinctly, and with Issue No. 3 divided into two separate parts, the issues raised by Defendant are as follows:

1. The Court abused its discretion by imposing sentences on Counts 1 and 2 that significantly exceeded the aggravated ranges of the Sentencing Guidelines and imposing such sentences consecutively, in that such sentences are manifestly excessive in light of the evidence adduced at trial and the fact that the three shots constituted one act.

2. The Court erred by failing to merge Count 1 and Count 2 for sentencing purposes.

3.

   a. The Court erred by failing to grant Defendant's motion for judgment of acquittal as to each of the three counts on the

4

basis that the Commonwealth failed to disprove his claim of self-defense beyond a reasonable doubt.

    b. The Court erred by failing to grant Defendant's motion in arrest of judgment on the basis that the criminal information did not charge three separate criminal acts, and yet the Commonwealth proceeded on that basis at trial, and further that the evidence at trial showed that the three shots were fired in a single criminal act.

4. The Court erred by failing to grant Defendant's motion for new trial based on the weight of the evidence, on the basis that the greater weight of the evidence at trial demonstrated that Defendant had acted in self-defense.

5. The Court abused its discretion in admitting four photographs of the victim's bullet wounds at trial, as the sensational nature of these photographs unfairly prejudiced Defendant to a degree that outweighed their probative value, particularly since they were cumulative of other evidence such as the autopsy report and testimony of the pathologist.

6. The Court erred by denying Defendant's motion to suppress all evidence obtained as a result of the warrantless entry, search, and seizure that occurred at Defendant's residence.

7. The Court erred by denying Defendant's motion to suppress all evidence obtained as a result of the search warrant issued on April 5, 2022, at 9:53 am, on the grounds that the Court was without jurisdiction to issue the warrant.

8. The Court erred by denying Defendant's motion to suppress all evidence obtained as a result of the search warrant issued on April 5, 2022, at 9:53 am, on the grounds that the warrant was not served in compliance with the procedural requirements of Pa.R.Crim.P. 200–212.

9. The Court erred by denying Defendant's motion to suppress all evidence obtained as a result of the search warrant issued on April 8, 2022, at 10:53 am, on the grounds that the Court was without jurisdiction to issue the warrant.

Because many of the issues raised between the claims of error overlap, and the analysis of some of them naturally builds upon the analysis of others, the Court will address them in a different order than that in which they were raised (but with Defendant's numbering maintained). The Court will also merge the analysis of some of the issues, as appropriate.

### III. ANALYSIS

*A. Relevant Facts*

The evidence relevant for the consideration of the issues raised by Defendant falls into three broad categories: (1) the history of the ongoing dispute that had been occurring between the Skippers and the Campbells, which led up to the shooting; (2) the events that occurred on the evening of April 3, 2022; and (3) the physical and testimonial evidence obtained as a result of the Commonwealth's criminal investigation.

**1. History of the Ongoing Dispute**

The basic outline of the dispute from the Skippers' view is set forth in the opening above. But there are additional relevant details. As noted, both the victim and Mrs. Skipper were former heroin addicts who had fought hard to get clean. Both had criminal convictions from 2017. Mrs. Skipper had been convicted of simple possession and possession of drug paraphernalia, and had served four years' probation. N.T., Trial, Oct. 17, 2023 ("Day One"), at 48.[1] The victim had been convicted of three counts of possession with intent to deliver and one count of

---

[1] The Court takes judicial notice of the criminal docket for case no. CP-31-CR-134-2017, Mrs. Skipper's drug convictions.

conspiracy to commit PWID.[2] He was accepted into the state drug treatment program and served a sentence of two years in that program, followed by two years' probation.[3] After getting clean, Mrs. Skipper worked as a nurse. The victim had taken a number of classes while in the state drug treatment program and became employed at Manitowoc after release, first as a welder and then as a robot operator. He also did odd jobs on the side to make additional income. N.T., Day One, at 46–48. The Skippers had lost their prior home as part of their 2017 drug convictions and had lived with other family members for a time while getting back on their feet. By working a significant number of hours they had managed to save enough to obtain a loan and purchase their home on Springhill Drive.

At the time of their 2017 arrests the Skippers had owned three firearms: a shotgun (which technically belonged to one of their sons); a hunting rifle; and a 9mm handgun. These had been seized by the Commonwealth as part of the criminal cases. After her criminal case had been resolved, Mrs. Skipper worked with an attorney to have the firearms returned and transferred to her father, rather than forfeited. Mrs. Skipper was adamant that she and her husband did not have any firearms at their Springhill Drive residence in April 2022. She was prohibited from possessing firearms due to her probation, and the victim was prohibited from owning or possessing firearms due to his multiple felony convictions. Id. at 49–50.

After moving in, the Skippers got to know their neighbors, and generally were on good terms with them. They had asked a couple of the neighbors to slow down when going past their house on Springhill Drive when they first moved in, out of concern for their children. With the exception of the Campbells, all of the neighbors had understood and were fine with it. Id. at 50–51. Mrs. Skipper tended to keep to herself more, in part because she worked night shift, but she became friends with a neighbor who she also worked with, and got to know the parents of

---

[2] The Court takes judicial notice of the criminal docket for case no. CP-31-CR-62-2017, the victim's drug convictions. Although not captured in the transcript, the Commonwealth specifically noted these convictions in its opening statement.

[3] See id.; see also N.T., Day One, at 48.

7

the children who lived nearby. Id. at 47. The victim became friends with a number of the neighbors, including Curtis Guyer, who lives at 8043 Campbell Circle next to the Campbells' residence, and Rudy D'Alesio, who owns a second home located at 21588 Springhill Drive, roughly across from the Skippers. Id. at 90-91; N.T., Trial, Oct. 19, 2023 ("Day Three"), at 1–3.

Curtis Guyer is married to Samantha Christine Guyer, who is Defendant's cousin. He had known Defendant for approximately seventeen years, and had lived at 8043 Campbell Circle with his wife and her father for approximately ten years. N.T., Day One, at 91–92, 119. Campbell Circle is a private lane that branches off of Springhill Drive, crosses Defendant's property, and leads to both Defendant's house and the Guyers' house. Mr. Guyer became friends with the victim after the Skippers moved into their home. The victim often came up to the Guyers' residence and worked on vehicles and equipment with Mr. Guyer in his garage, including an old gray Ford pickup truck that the victim owned and a backhoe that the victim had purchased and repaired to get it in working order. Id. at 97–98, 121. The pickup truck was recognizable in the neighborhood in part because it had a loud exhaust. See, e.g., id. at 121.

Rudy D'Alesio is a retired police officer from Upper Darby, Pennsylvania. He continues to work part-time doing security work. He purchased his property on Springhill Drive in 1987 as a second home, originally coming up to hunt and fish, and began using it as a general getaway as the years went on. N.T., Day Three, at 1–3, 13–14. He was familiar with Defendant, and knew the victim. He had gotten to know the victim after the Skippers moved in, and had given the victim permission to go onto his property so the Skippers' children could fish in his pond. Id, at 3, 10-11.

The witnesses were all in agreement that Springhill Drive was in poor condition, that it could be treacherous if not plowed in winter, and that road maintenance was an issue. The road is narrow, so much so that in some places if two vehicles meet going opposite directions one of them has to pull over to the edge and stop to let the other one pass. It also has a number of steep hills. Because of its dirt surface, if someone drives too fast on the road, they stir up a cloud of

8

dust, which can cause problems for some of the neighbors. It also creates safety issues.[4] An association had been formed back in 1971 among the property owners specifically regarding the road, with responsibility for maintaining it, plowing it, and setting basic rules for its use.[5] At some point, the association had placed private speed limit signs along Springhill Drive, setting a limit of 10 MPH.[6] When Mr. D'Alesio first purchased his home, the association was run by Defendant's grandparents.[7] Over time, the association had become inactive, and maintenance became an issue. Control over the association had apparently gone to Defendant and his wife by default after his grandparents moved, and Defendant did not keep on top of things.[8] The association was inactive enough that the Skippers had no knowledge or notice of it when they purchased their home. They did not learn about it until approximately the fall of 2021, when Defendant and his wife sought to "organize" the association and get it active again.[9]

Because of all the issues with road maintenance, the victim set out to improve the situation. He used the old backhoe he had purchased to repair damaged areas of the road. He also used it to carry loads of sand to refill the sand barrels that were stationed at points along the road for use when the road became icy. In the winter, he plowed the road promptly after each snowstorm, using his old Ford pickup truck. He also plowed many of the neighbors' driveways, and helped those who had trouble getting in and out of the neighborhood. Some of this work he did on his own, and some of it he did with the help of certain neighbors or

---

[4] N.T., Day One, at 56; N.T., Day Three, at 6–7, 8, 94–95.

[5] N.T., Day One, at 51, 53; N.T., Day Three, at 7–9.

[6] N.T., Day Three, at 6, 41.

[7] N.T., Day Three, at 9.

[8] See N.T., Day One, at 100, 101–102 (Curtis Guyer; the road was in poor shape and was not maintained, no road fees paid in the ten years he had lived there; Defendant plowed the snow, but would wait until days after each storm); N.T., Day Three, at 8, 9 (Rudy D'Alesio; after Defendant's grandparents moved away "it didn't seem like anything was getting done" beyond the bare minimum to keep the road open; Defendant plowed the road before the Skippers moved in); id. at 30 (Defendant; there were a number of neighbors who had not paid fees to the association for years, and he and his wife were trying to get the association "organized" again).

[9] N.T., Day One, at 51–52.

9

his brother, Dustin, who also lived in the neighborhood.[10]  The victim never asked to be paid for any of this work.  Instead, he did it to try to improve the situation.[11]

The appearance of the Skippers in the neighborhood, their new relationships with the existing neighbors, the victim's performance of work on the road and driveways, and the Skippers' request that the Campbells slow down when going past their house, were all triggers for Defendant's anger.  Per Mrs. Skipper, the Campbells were among the neighbors that the victim asked to slow down not long after the Skippers moved in.[12]  In response, the Campbells not only continued speeding, but seemed to speed up intentionally when going past the house.[13]  At some point in the fall of 2021, Defendant and his wife sought to reassert authority over the neighborhood via the association.  Each of the neighbors received a letter from the Campbells, via the association, declaring that all residents needed to register their ATVs with the association in order to use them on the road, and stating the annual fee that was to be paid to the association was going to be raised from $50.00 per year to a much more significant amount.[14]

---

[10] N.T., Day One, at 59–60 (Hillary Skipper; Defendant confronted the victim twice when he was doing road maintenance, including once when he was snowplowing in his truck with his brother); id. at 96, 100–102 (Curtis Guyer; the victim's brother, Dustin, lived in the neighborhood; the victim purchased the backhoe with the intent of using it to fix up the road, and used it to fix the road and various neighbors' driveways; the victim plowed promptly after each snowstorm, and came out one time to plow Campbell Circle when Defendant refused to plow the lane and Mrs. Guyer needed to get to work); N.T., Day Three, at 8–10, 12 (Rudy D'Alesio; after moving in, the victim took on the tasks of plowing the road using his truck and fixing the road using his backhoe; the victim kept the sand barrels filed and Mr. D'Alesio helped him with this; the victim and his brother would help a female neighbor get up and down the road in the winter when she needed it; the victim would plow Mr. D'Alesio's driveway in the winter without being asked, instead just giving him a phone call and letting him know that it had been done).

[11] N.T., Day One, at 85–89 (Hillary Skipper; the victim never asked to be paid for the work, though some of the neighbors offered to give him money for fuel as a thank you—she remained firm about this despite repeated, heated questioning by Defendant's counsel alleging that the victim was angry about not being paid and refused to pay fees to the association because of it); id. at 102 (Curtis Guyer; the victim did not ask for money for the plowing or repair work).

[12] Id. at 50–51, 74–75.  Note that both Defendant and his wife denied having ever spoken to or communicated with the victim regarding speeding prior to the shooting.  Id. at 135–36; N.T., Day Three, 30–31, 65.

[13] Id. at 51 (Mrs. Skipper, noting both the intentional nature of the behavior and that Defendant, his wife, his mother, and his mother's paramour all engaged in the behavior).

[14] Id. at 52 (Mrs. Skipper; giving the basic outline of the letter and stating that the fee was going to be "much larger" than the allegedly existing $50.00 per year), 99 (Curtis Guyer; letter stated the fee was going to be either $200.00 or $250.00 per year, though he did not recall the amount exactly), 142 (Brandy Campbell; she

10

Neither the Skippers nor the rest of the neighbors took it well. For the Skippers, it was the first they had heard anything about the association. Mrs. Skipper researched the issue and believed the association was invalid, as it had not been registered since 1971.[15] One of the other neighbors started a petition to dissolve the association. It was signed by the Skippers and a large number of the other neighbors and then sent to Defendant and his wife by Certified Mail.[16] A meeting of the association was held at the Campbells' residence in December 2021, and it was Mrs. Skipper's understanding that at that meeting, the neighbors passed a vote to dissolve the association, meaning the association was no longer in existence.[17] The Campbells apparently believed differently.[18] Regardless of when the letter was received or whether the vote was effective, the Campbells were both aware of it and angered by it.[19]

The Campbells, for their part, both testified that they "never" sped past the Skippers' residence, and drove slowly on the road. Id. at 143 (Mrs. Campbell; Defendant "never" sped past the Skippers' residence, and neither did she; she drove 10 MPH, 15 MPH "at the max."); N.T., Day Three, at 41 (Defendant on direct examination; he tries to keep his speed on Springhill Drive to "around 10 to 15 [MPH]," and has never driven faster than 15 MPH past the Skippers' residence). This was in conflict not only with Mrs. Skipper's testimony, but also Mr. D'Alesio's. Id. at 7 (Mr. D'Alesio's testimony on direct examination regarding Defendant's driving habits on Springhill Drive; "He drove fast every time he came up.").

---

and Defendant sent the letter out, characterizing it as setting a meeting of the association members to discuss "possibly" raising the annual fee, since it had not been raised in years).

[15] Id. at 51–52, 53.

[16] Id. at 55, 84, 142.

[17] Id. at 55.

[18] Id. at 142 (Brandy Campbell claiming that they did not receive the letter regarding the petition until after the December 2021 meeting).

[19] See id. at 55–56 (Mrs. Skipper, in response to what observations led her to the conclusion that the Campbells were angry about the petition: "Well, the speeding past the house increased. They were staring at us. Our [road] is shared and it's very narrow going up the hill. They have big vehicles. They make sure we get pushed off to the side of the road.").

11

The witnesses were also in agreement that there were at least two instances of direct contact between Defendant and the victim prior to the shooting. One occurred when the victim was attempting to smooth out the stretch of Campbell Circle between Springhill Drive and the Guyers' driveway. Id. at 59–60 (Mrs. Skipper), 101 (Curtis Guyer), 154 (Mrs. Campbell); N.T., Day Three, at 31 (Defendant). The other occurred while the victim was plowing snow on Campbell Circle after a storm. N.T., Day One, at 59–60 (Mrs. Skipper), 155 (Mrs. Campbell); N.T., Day Three, at 31 (Defendant). With respect to the first incident, the stretch of Campbell Circle between Springhill Drive and the Guyers' driveway is apparently quite rough, and has a deep ditch across it near the intersection with Springhill Drive. Mr. Guyer had asked the victim to come up with his backhoe and repair Campbell Circle because the condition of the road was poor enough it was causing the Guyers' car to bottom out. N.T., Day One, at 100–101. The victim started to fill in the ditch using his backhoe, and when Defendant and Mrs. Campbell saw this, they went out on their ATV to stop him. Despite multiple claims by Defendant's counsel, both in his opening statement and during cross-examination, that the victim used his backhoe to "tear apart" the Campbells' driveway and rip up buried wires, it was clear that the incident itself was uneventful. See id. at 154 (testimony of Mrs. Campbell on cross-examination by Defendant's counsel, when asked to describe the one interaction she claimed to have had with the victim);

Q: What is that interaction?

A: That would be when he came up our driveway with his backhoe and was digging, I guess, to attempt to fix the roadway.

Q: What did you see?

A: As he was digging my husband and I drove over of the four-wheeler to ask him to stop because of our electric lines underneath the driveway. And when he had asked him to stop, he says, I'm sorry, man. I didn't know, and continued up our driveway to our neighbor's.

12

and N.T., Day Three, at 31 (Defendant's testimony on direct examination).

Q:   And had you—can you tell the ladies and gentlemen of the jury what the nature of those encounters were and what prompted those or what they were about?

A:   So one encounter I confronted—well, me and wife confronted Tim. He was on the backhoe coming up our driveway.[20] He started to fill in a rain redirect ditch. We took the four-wheeler over. We just asked him kindly hey, can you not do that? We're having problems with our other neighbor complaining about water run off. I have the road the way I want it. Just please don't touch the driveway.

Q:   All right.

A:   He said okay, my mistake. I apologize, this and that and that was the end of that.

Defendant later clarified that he was also concerned during this incident because the Campbells' have wires run under Campbell Circle that supply power to an electric fence for the livestock they keep on the far side of the road, and the victim could possibly have damaged them if he dug into the roadbed while making repairs. Id. at 33.

Turning to the second incident, this is where the differences between the version of events testified to by Defendant and his family members, and the version of events testified to by the Commonwealth's witnesses, became significant. Defendant described the event as follows on direct examination:

Q:   Okay. Was there anything else relative to the property?

A:   So he was—that winter—I don't remember the month—he was plowing the driveway with his truck. We've asked him in an email my wife sent previously to no plow it or do anything with our driveway politely. So I told her, I said, I'm going to go down and talk to him face-to-face, so I took her car. I went to the bottom of the driveway and I waited. As Tim was coming down I flagged him down. He came to a stop. His brother Dustin was in the truck with him. I walked up and I said hey, like, we've asked you numerous times not to plow the driveway. Can you please stop? You're disrupting—you're causing[sic] to dig the dirt up, causing headaches. He said—he

---

[20] Defendant and Mrs. Campbell consistently referred to Campbell Circle as their "driveway," despite the fact that it exists as a named road and is used to access both their house and the Guyers'.

13

came back at me and was saying about how there is this right-of-way—written right-of-way shared between me and the Guyers. I wasn't plowing or maintaining the driveway, that he was going to do it.

I informed him that that is incorrect. I have the deeds to my property, the Guyers' as well as the previous deeds to both properties and there's never been any written right-of-way. There's never been a written agreement or anything like that. So from my understanding that it was my property—my driveway to maintain and all I asked him was a simple ask me, not to go through anybody else. He came back to me and was saying I was a liar and some other names I'd rather not say.

At that point I noticed laying between him and his brother there was a firearm. I believe it was a pistol. I told him I said, listen, I sai[d], I'm done with this, Tim. I said, I'm going to go find a lawyer. I'm going to get some legal advice. I want to get a deed on the driveway, so I'm going to talk to a lawyer. The conversation basically ended when he told me I could go— excuse me—but go fuck myself and sped away.

\*\*\*

Q:     When Mr. Skipper told you to go F yourself, what was his demeanor? How did he appear to be?

A:     Shooting fire balls would be the closest things.

Q:     Okay.

A:     Just glaring at me.

Q:     When he left did he pull out slow or how did he leave?

A:     I believe he attempted to kick rocks up and there are[sic] like a burn out but, yeah, it wasn't slow, no, calm.

Id. at 31–33. On cross examination, Defendant clarified that this incident occurred in early March 2022, about a month prior to the shooting. He also contradicted his earlier testimony regarding where the pistol was located (which was originally on the seat between the victim and his brother), and claimed that the firearm was in the victim's possession. Id. at 56 ("It was under his leg like cocked.").

Defendant testified that the snowplowing incident was not the first time he had seen the victim with a gun. Approximately six or seven months prior to the shooting, he had driven past the Skippers' home and saw the victim standing

14

outside in the yard with a handgun in a holster on his right hip. Id. at 34, 60. Defendant was adamant that it could not have been anything other than a handgun, despite the fact that at the time he allegedly witnessed it, he was driving, it was evening light (between 6:30 pm and 7:00 pm), and the victim was standing thirty yards away. Id. at 60–62, 64. Mrs. Campbell testified as to a similar instance in which she claimed to have seen the victim carrying a gun. She gave no date, time, or situation, other than she had seen him outside of the Skipper residence with a holstered handgun on his right hip. N.T., Day One, at 155.

One other witness who testified for Defendant claimed that he had seen the victim armed with a handgun. David Quarry, Mrs. Campbell's father, testified that two or three months before the shooting he had driven up Springhill Drive with his wife and son to visit the Campbell family, and was confronted by the victim regarding his speed.

A:    We drove up, went past Tim's house. As we were pulling in up at my son-in-law's house, Mr. Skipper come driving in behind us. I got out of the car. He got out of the car. Made the statement that I needed to F-ing slow down, that there was F'in kids down there and they could have got hurt. My response was that I wouldn't be able to speed on that road if I wanted to.

Q:    Why is that?

A:    Because it was in such bad shape that probably would have tore my car apart.

***

Q:    You had the conversation?

A:    Yes. And at that point as he was saying this, he brushed his coat back or whatever it was. I'm not sure exactly what he was wearing and there was—he had a gun on his side.

Q:    Did you see that for sure?

A:    Yes.

Q:    How was it that you were able to see the gun?

A:    He basically made sure that I saw it. He brushed his coat or whatever he had on there.

Q:    Where was the gun located?

15

A: It was on his right side.

Q: And can you describe the gun at all if you can?

A: It wasn't a revolver. It was—would be more of a gun in the style of either a Glock or maybe a Smith & Wesson, something in that nature but it was not a wheel gun.

Q: I don't know what a wheel gun is.

A: That's a revolver.

N.T., Day Three, at 94–95. Mr. Quarry testified that after the victim brushed his coat back to show the him the gun, the victim repeated to Mr. Quarry that he needed to slow down, and then left. Mr. Quarry then went inside and told Defendant what had happened. Id. at 96–97. Mr. Quarry did not call the police about the incident, and did not ask Defendant to check to see if Defendant's camera system had recorded the alleged incident, despite being concerned by it. Mr. Quarry also did not seek out any of the investigating state troopers to tell them about the alleged incident after the shooting occurred. The first mention he made of it was in response to questions he was asked by state troopers when they interviewed him three or four days after the shooting happened. Id. at 98–101.

As noted above, Mrs. Skipper testified that the guns that she and the victim had owned had been seized by the Commonwealth as part of their criminal cases, those guns had later been transferred to her father, and that neither she nor the victim had been in possession of any firearms since those few guns had been seized. Mr. Guyer, while not aware of the victim's criminal convictions, had never seen the victim in possession of a firearm. N.T., Day One, at 98. Mr. D'Alesio did know that the victim was a convicted felon (and thus ineligible to possess firearms), and had never seen the victim in possession of a firearm—whether carried on his person or in his truck. N.T., Day Three, at 12–13.

Mrs. Campbell testified that after the alleged incident with her father, she looked up the victim's criminal docket and discovered that he was a convicted felon with drug charges, meaning he was prohibited from possessing firearms. N.T., Day One, at 157–58, 165. She did not go to the police with his information.

16

Rather, she provided it to Defendant, who reached out to some of his "friends" in law enforcement via text messages for advice. Id. at 165–167.

The Commonwealth presented three sets of text messages that were revealing as to Defendant's mindset about the situation and his attitude toward the victim and the Skipper family in general. The first did not address the alleged incidents of firearms possession. Rather, it was in regard to a warning that Mrs. Campbell sent to Defendant and other family members on February 5, 2022, via Facebook Messenger, regarding the safety of the Skippers' children: "Whenever y'all head out be careful because Skippers kids were sledding onto the road." In response, Defendant sent a GIF in the form of a screen capture from the movie *Rocky IV*. The image is of the lead antagonist, Ivan Drago, uttering the line "If he dies, he dies." See Commonwealth's Exhibits 5 and 6; see also N.T., Day One, 143–148 (testimony of Mrs. Skipper confirming that she sent the message).

The second set of messages that were admitted pertained to the alleged firearms possession. On March 12, 2022, Defendant, via Facebook Messenger, sent a text message to Pennsylvania State Police Trooper Paul Brenneman. Trooper Brenneman was an old acquaintance of Defendant's, whom Defendant knew as "PJ."

| | |
|---|---|
| DEFENDANT: | Hey I hate to bug you. Who would you contact if your neighbors that moved in ya found out are felons which is whatever but they still carry a firearm and have come onto your property multiple times. There not on it now just makes me uneasy with the kids. |
| TROOPER BRENNEMAN: | As far as the no trespassing, make sure it's posted and if they trespass call psp. As far as the firearms if you know they are felons and fall under one of the sections regarding person not to possess you could call then in on that to either probation/parole if they're on it. If not report it to psp. |
| DEFENDANT: | Okay man thanks. Yeah we have a bright reflective sign for no trespassing for the |

17

driveway. I give them a call just hate being one of those lol but not risking it in this world with the kids.

TROOPER BRENNEMAN:     Yeah, I don't blame you.

Defendant's Exhibits 4, 4A (text as in the original, timestamps removed for clarity); see also N.T., Day One, at 168–170 (Mrs. Campbell discussing her knowledge of the message), N.T., Trial, Oct. 18, 2023 ("Day Two"), at 159–66 (testimony of Trooper Brenneman regarding the text exchange, including that Defendant never sent him further messages regarding the situation and never identified the victim as being the felon allegedly in passion of a firearm on Defendant's property).

The final set of text messages also pertained to the alleged firearms possession by the victim and were exchanged via Facebook Messenger. They were between Defendant and Joey Allen, a friend of his who worked at Youth Forestry Camp #3. N.T., Day Three, at 38–40.

DEFENDANT:     I know you work the kids side but maybe your or Leo[21] would know. How can you find out if someone's on parole or probation? We have a new neighbor who's a felon which is whatever but has carried a firearm onto my property. I didn't catch it her parents did. I talked to a trooper and told me to call psp for trespassing but told me if he's on either of those to call his probation or parole officer if is on it.

JOEY ALLEN:     Do you know his name? I'll see if Leo can get one of his friends record to view but off hand I'm not sure what site to go through for it.

DEFENDANT:     Timothy Skipper Jr. 11/19/81 DOB. Found some records of felony just couldn't find if on probation or anything or if was the felony type that can't be in possession or anything of a firearm wasn't sure how all that went.

Know he's on something that he doesn't want brought back up cuz when I told him I'd get legal action and all he shut up and left. **Tried to spin**

---

[21] Defendant clarified that "Leo" referred to Leo Scalia, a mutual friend of Defendant and Joey Allen who worked as a probation officer. N.T., Day Three, at 39.

**his wheels but his truck was too shitty lol
other wise woulda shot his back window out.**

Defendant's Exhibit 4A, at 2 (not paginated in the original, text as in the original),

Commonwealth's Exhibit 127 (emphasis added, otherwise text as in the original);

see also N.T., Day Two, at 184–90 (testimony of Trooper Christopher Bourne

regarding how the messages were obtained and presenting the text of the

messages).  On direct examination, Defendant admitted that he had sent the

messages to Joey Allen soon after the snowplowing incident, and characterized

himself as "angry" and "heated" at time he sent the messages.  N.T., Day Three, at

38–40.

     The Commonwealth also presented an item of evidence that bore on

Defendant's mindset in regard to the use of deadly force; a picture of a sign

hanging on the inside wall of the Campbells' residence, in the dining area, not far

from where the shooting occurred.  It shows a pair of crossed revolvers and reads

"WE DON'T CALL 911."  Commonwealth's Exhibit 74; N.T., Day Two, at 44–45

(testimony of Corporal Travis Garner, identifying the photograph).  During his

direct examination, Mr. Quarry claimed that he and his wife had purchased the sign

for the Campbells as a Christmas gift a few years earlier, because "[t]hey have a

sort of western theme in their house," and that the sign "was sort of a cross

between that and a little bit of a gag that we had going but nothing—didn't mean

anything really."  N.T., Day Three, at 97.[22]  Also admitted were pictures of a sign

Defendant posted at the bottom of Campbell Circle that reads "PRIVATE DRIVE/NO

TRESPASSING."  Commonwealth's Exhibits 119–121.

---

[22] Defendant, in an apparent attempt to counteract the "WE DON'T CALL 911" sign, submitted a picture of a
sign that had been posted at the bottom of the Skippers' driveway.  It showed a picture of a handgun and read
"If you are seen here tonight...you might be found here tomorrow."  Defendant's Exhibit 2.  Mrs. Skipper
testified that the sign had been put up by the prior owner of their house, and they had just left it up.  She took
it down and replaced it with a "no trespassing" sign a short time after the victim was killed.  N.T., Day One, at
81–83.

## 2. Events of the evening of April 3, 2022.

### a. Video recordings.

The key evidence against Defendant were video recordings from two separate systems located at the Campbell residence. The first system was an Amcrest-brand video surveillance system equipped with cameras inside and outside of the house (the "Surveillance System). The Surveillance System recorded video only, and stored that video on a DVR router that was located in a closet in the Campbells' residence. The Commonwealth obtained the DVR router via a search warrant executed on the Campbells' residence on the night of the shooting, and obtained the video recordings from the DVR router via a separate search warrant. The Surveillance System was equipped with three cameras; recordings from two of the cameras were used at trial. One camera was located outside of the house with a view of the driveway, Campbell Circle, and a portion of Springhill Drive, identified on screen as "Fence Side." The second camera was located in the kitchen of the Campbell residence, was labeled "Kitchen" on screen, and had a full view of the entrance door and immediate interior area of the house where the shooting took place. These videos were admitted as Commonwealth's Exhibit 126. See N.T., Day Two, at 175–77 (testimony of Trooper Bourne regarding how the videos were obtained from the Surveillance System).

The second system was a "doorbell camera," sold under the Zumimall brand, that recorded video and audio from a location just to the side of the main entrance door to the home (the "Doorbell Camera"). The Doorbell Camera, which was located on the same side as the doorknob, was motion-activated, so the video and audio obtained from it was "jumpy" and intermittent. There were also issues with the audio not being synchronized with the video. The only copy that was available was the file that was stored on and downloaded from Defendant's cell phone. The Commonwealth had attempted to contact the Zumimall company to determine if the video file might also be stored on the device itself or on a cloud server, but the only address available was in China, and the company did not respond to inquiries. The video from the Defendant's cell phone was admitted as

20

Commonwealth's Exhibit 125. See N.T., Day Two, at 173–75, 181–82 (testimony of Trooper Bourne regarding how the video was obtained and the issues with it).

Both videos from the Surveillance System are stamped with the date and time of the recording. Starting with the exterior, "Fence Side" video, the pertinent events shown are as follows:

| Time Stamp | Event(s) | Time Elapsed From Start |
|---|---|---|
| 7:31:51 pm | The headlights of Defendant's vehicle become visible through the trees for a moment as he travels up Springhill Drive toward his home. | 0 seconds |
| 7:32:19 pm | Defendant is still travelling up Springhill Drive, and has not yet reached Campbell Circle. The headlights of the victim's truck can be seen off in the distance, also travelling up Springhill Drive. | 28 seconds |
| 7:32:22 pm | Defendant turns onto Campbell Circle from Springhill Drive. | 31 seconds |
| 7:32:44 pm | Defendant's vehicle becomes clearly visible as a red Dodge Journey SUV as he turns right off Campbell Circle into his driveway, just after passing a small shed on his right. | 53 seconds |
| 7:33:00 pm | The victim turns onto Campbell Circle. | 1 minute, 9 seconds |
| 7:33:16 pm | The victim's vehicle becomes clearly visible as an older, silver Ford pickup truck as he turns off Campbell Circle and into the Campbells' driveway. | 1 minute, 25 seconds |

Using the point in time at which each vehicle passed the small shed just before the entrance to the Campbells' driveway, the victim arrived at the Campbells' residence approximately thirty-three seconds behind Defendant.[23]

Moving to the interior, "Kitchen" video, this video is the most significant, as it shows the entirety of the shooting. The view is of the kitchen and dining area of the Campbells' residence, with the entrance door at the top of the screen, toward

---

[23] Defendant's vehicle passes the shed at 7:33:42 pm, and the victim's vehicle passes the shed at 7:33:15 pm.

21

the left-hand side. The room is very cluttered. The left side of the door is three or four feet from a corner formed by the intersection of two of the exterior walls. The door is of the standard width and the doorknob is on the right-hand side of the door. Approximately two feet to the right of the door is a large cardboard box placed against the wall, perhaps three feet tall, three and one-half feet wide, and two and one-half feet deep. The box is being used as an impromptu table, and has a number of items piled on top of it. There is a rectangular dining table with six chairs around it located near the door and the box. The upper right-hand corner of the table lines up with the left-hand edge of the box, leaving an aisle about two feet wide to walk through. The table is parallel to the walls of the house, with the short side parallel to the wall with the door, extending to the left such that it is partially behind the door. There is a chair positioned at the short edge of the table, between the table and the door. This positioning means that with the door halfway open, there is only about one and one-half feet of space between the door and the chair. There are also items on the floor between the box and the right-hand side of the doorway, and on the floor to the right of the box, extending into the walking path. The pertinent events shown are as follows:

| Time Stamp | Event(s) | Time Elapsed From Start |
| --- | --- | --- |
| 7:33:11 pm | Defendant opens the door and enters the house. He is wearing dark blue pants, a green hooded sweatshirt, boots, and a baseball hat. As he is coming through the door he is reaching into the front pocket of his sweatshirt and pulling out an object. | 0 seconds |
| 7:33:11 pm – 7:33:13 pm | Defendant continues to enter the house, swinging the door closed behind him as he pulls the object out of his pocket. The object is revealed to be a pistol in a holster, which Defendant sets down on the upper right-hand corner of the table as he walks through the gap between the corner of the table and the cardboard box. | 2 seconds |

22

| Time Stamp | Event(s) | Time Elapsed From Start |
|---|---|---|
| 7:33:13 pm – 7:33:17 pm | Defendant walks out of the kitchen toward the back of the house. He goes out of view at 7:33:17 pm, exiting toward the lower left-hand corner of the frame. | 6 seconds |
| 7:33:33 pm – 7:33:37 pm | Defendant comes back into view from the lower left-hand corner of the frame. He is carrying an AR-15-style rifle in his right hand, holding it by the pistol grip with the muzzle pointed at the floor, roughly parallel to his right leg. He walks toward the door | 26 seconds |
| 7:33:37 pm – 7:33:38 pm | Having reached the gap between the corner of the table and the cardboard box, Defendant lays the rifle on top of the box, with the muzzle aimed forward toward the outside wall, but does not let go of it. The rifle can clearly be identified as an AR-15-style, equipped with optical sights and a thirty round magazine. | 27 seconds |
| 7:33:39 pm | Defendant pauses for a moment with the rifle laying on top of the box. He stands with his weight on his right leg and his left leg slightly bent and relaxed, looking toward the door as though he is contemplating his next move. He is still holding onto the pistol grip of the rifle with his right hand. | 28 seconds |
| 7:33:40 pm – 7:33:42 pm | Defendant, moving decisively, steps toward the door. As he does so, he picks the rifle up off the cardboard box and stages it roughly vertically to the right of the door, with the muzzle on the floor and the buttstock leaning against the cardboard box. | 31 seconds |
| 7:33:43 pm | Defendant opens the door using his left hand on the doorknob. | 32 seconds |
| 7:33:45 pm – 7:34:06 pm | Defendant stands with the door opened about forty-five degrees, with his left hand holding onto the edge of the door near the top and his body blocking the opening into the house. He engages in an argument with the victim, who can partially be seen standing on the stoop outside | 53 seconds |

23

| Time Stamp | Event(s) | Time Elapsed From Start |
|---|---|---|
| | of the door-time. Both men can be seen gesturing toward Springhill Drive with their right hand, and gesticulating with their hands generally (noting that Defendant never removes his left hand from the door). When Defendant is not gesturing, his right hand hangs loosely down by his side. Neither man makes a move toward the other that signals any sort of physical attack. | |
| 7:34:07 pm | Defendant looks down and to the right toward the rifle, and then picks it up. | 54 seconds |
| 7:34:08 pm | Defendant begins bringing the rifle to his shoulder, aiming the muzzle out through the doorway toward the victim. | 55 seconds |
| 7:34:09 pm | Defendant fully shoulders the rifle and levels it at the victim. | 56 seconds |
| 7:34:09 pm – 7:34:10 pm | The victim, still standing on the stoop outside of the door, grabs hold of the barrel of the rifle and forces it downward and to Defendant's right. At the same time, he drives his body forward toward Defendant, continuing to push the muzzle of the rifle downward and to the right so that it is aimed at the ground, while simultaneously grabbing hold of the hood of Defendant's sweatshirt in an attempt to gain physical control of him and keep Defendant from being able to bring the rifle to bear. | 57 seconds |
| 7:34:10 pm – 7:34:12 pm | The two men enter the house fully, with the victim continuing to drive forward, shoving Defendant backward. Defendant moves to his right just after the victim's feet cross the threshold. His buttocks hit the back of the chair at the end of the dining table, shoving it into the table and shoving the table sideways. His left shoulder and head hit the light that hangs over the table, setting it swinging. Both men have their upper body angled toward the other, and their legs angled behind them, driving against the other. The victim has the advantage and | 59 seconds |

24

| Time Stamp | Event(s) | Time Elapsed From Start |
|---|---|---|
| | Defendant struggles to gain traction until the chair at the end of the table, which Defendant's body had pushed out of his way, is spun by Defendant's left hip so that it comes between the two men. | |
| 7:34:13 pm | The chair, now fully between the two men, prevents the victim from being able to continue driving Defendant backward. Defendant regains his footing and shoves forward toward the victim. The victim struggles to keep the rifle aimed away from him, but Defendant manages to maneuver the rifle so that the muzzle is aimed toward the victim's left lower leg. | 1 minute |
| 7:34:14 pm | Defendant fires the first shot, hitting Defendant in the left lower leg. The victim's left foot and lower leg can be seen snapping backward from the force of the bullet strike. | 1 minute, 1 second |
| 7:34:14 pm – 7:34:16 pm | The victim falls forward, going to his knees. Defendant pulls the rifle out of the victim's hands and the victim lets go of Defendant. Defendant takes two steps back and raises the rifle, pointing it toward the victim's chest. The victim, who initially was bent forward at the waist, brings himself upright, still on his knees, with his right hand held in front of his chest, palm toward Defendant, and his left arm and hand down by his side. He begins to lean backward and angle toward the open door, raising his right arm and hand as though to try to shield himself. His posture conveys surrender, not attack. | 1 minute, 3 seconds |
| 7:34:16 | Defendant fires two more shots in quick succession. The second shot is fired as the victim is still facing toward Defendant. After the second shot, the victim quickly pivots left, so he is facing the open doorway and his upper body is perpendicular to Defendant. Defendant then fires the third and final shot. | 1 minute, 3 seconds |

25

| Time Stamp | Event(s) | Time Elapsed From Start |
|---|---|---|
| 7:34:17 pm – 7:34:19 pm | After being hit with the third shot, the victim falls forward to the floor, briefly laying face down. He shifts his weight to his left hip, and, using his left arm and right leg, begins to half crawl/half drag himself out of the house, using the threshold for leverage. | 1 minute, 5 seconds |
| 7:34:20 pm | As the victim begins to crawl out of the house, Defendant moves forward and to his left, again raising the rifle and aiming toward the victim as though contemplating whether to fire again. | 1 minute, 6 seconds |
| 7:34:20 pm – 7:34:27 pm | The victim finishes crawling out of the house and rolls off the stoop. His body is fully out of the house at 7:34:23 pm. Defendant moves toward the door, following the victim out, with the rifle still shouldered but pointed toward the ground. | 1 minute, 13 seconds |

As can be seen above, a total of one minute and one second passed from the time that Defendant entered his house and the time that he fired the first shot. A total of one minute and three seconds passed from the time that he entered his house to the time he fired the fatal shots. Only twenty-four seconds passed from the time that Defendant opened the door and began arguing with the victim until the time he reached for the rifle.

Turning to the Doorbell Camera, this system captured a portion of the initial argument at the door, and then the aftermath of the shooting (at which point the victim had crawled out of the house and dragged himself to the front of Defendant's Dodge SUV). It did not capture the shooting itself. The entirety of the video was not played for the jury, as it shows Samantha Guyer and others trying to provide first aid to the victim, Mrs. Guyer and Mrs. Skipper performing CPR on the victim, and EMS personnel attempting to resuscitate the victim.

There is a timestamp on the video, but it does not match up with the Surveillance System. The motion-triggered nature of the Doorbell Camera meant

26

that the video that was played for the jury has three portions. Using the Doorbell Camera's timestamp, the video begins roughly at 19:36:19.[24] The first portion of the video extends for twelve seconds, and shows the victim standing outside the door, wearing blue jeans and an orange hooded sweatshirt, with his left hand partially in his left front pocket. Snippets of the victim speaking sternly about Defendant's speed when driving past the Skippers' residence can be heard, and the victim can be seen pacing slightly from side to side, gesturing with his right hand. The last audio that can be heard from this portion is something about "speed bumps."

The second portion of the video begins an unknown number of seconds after the first portion ends (the time stamp is not clearly discernable), and shows the victim after he had dragged himself out of the Campbells' residence and rolled himself off the stoop. This portion of the video extends for twenty-two seconds, and shows the victim crawling to the front of Defendant's SUV, propping himself up on his left elbow for a moment, and then collapsing. In the audio portion the victim can be heard exclaiming in pain, and Defendant can be heard screaming "Get Down!" twice (followed by something unintelligible) before yelling "Yeah! Fucking come in my house and grabbed me!"

The third and final portion of the video extends for approximately thirty seconds. It begins with Defendant standing in the driveway with his back to the camera, blocking the camera's view of the victim. He is holding the rifle in his right hand, with it hanging by his right side pointed at the ground, and he has a towel in his left hand. He gestures angrily with his left hand, pointing at his house while holding the towel, and eventually moves toward his right, to the front of a silver SUV also parked in the driveway. This reveals the victim still lying face down in front of Defendant's SUV. At the end of this portion Samantha Guyer comes into view. Defendant hands her the towel and she moves toward the victim to try to help him. In the audio in this portion, Defendant can be heard angrily yelling, with only a portion of his words discernible. What can be discerned is that he is

---

[24] 7:36:19 pm, expressed on a twenty-four hour clock.

27

continuing to yell that the victim "Came into my goddamn house!" and "Came into my fucking house!" At the end of it, Defendant reenters the house, still carrying the rifle, as Mrs. Guyer kneels down next to the victim. At that point, Defendant yells something about "I'm not a fucking paramedic!"

    b.   Testimony from witnesses for the Commonwealth.

Curtis Guyer and Samantha Guyer were lying in bed when they heard the victim's truck coming up Springhill Drive and then Campbell Circle. Thinking that the victim was coming up to visit him, Mr. Guyer got up and went out to their enclosed front porch. N.T., Day One, at 93 (Curtis Guyer), 120, 122 (Samantha Guyer). The couple heard three gunshots. Mr. Guyer went outside for a moment, saw the victim crawling on the ground outside the Campbells' residence, and then ran back into the house and told Mrs. Guyer "I'm pretty sure Cole shot Tim." Id. at 93, 94 (Curtis Guyer), 122 (Samantha Guyer). Mr. Guyer went back outside, followed shortly by Mrs. Guyer. Mr. Guyer walked about halfway down the driveway and stopped. He saw Defendant standing in the middle of the Campbells' driveway, holding his rifle in one hand with it pointed at the ground, and the victim laying on the ground off to the side. He yelled over to Defendant to ask what was going on, and Defendant yelled back "What's it look like? I shot him." Id. at 94–95, 107. Mr. Guyer was concerned that Defendant, who was still armed and yelling angrily, might shoot someone else, and told Mrs. Guyer to stay back. Defendant heard this and denied it. "I was still over in our yard. My wife was at the top of the driveway and whenever we was—I told my wife, I said, watch. Don't go over there. And he looks over at me and goes, I would never shoot you guys." Id. at 95, 107.

Mrs. Guyer works as a licensed practical nurse. Her first instinct was to go over and try to help the victim, despite the danger presented by the gunfire and Defendant's demeanor. When she got outside and started toward the Campbells' residence, she saw her husband had stopped halfway down the driveway. He told her stop, because Defendant still had the rifle. She looked over and saw the victim laying on the ground near Defendant's SUV, and Defendant standing in the doorway to his residence, still holding his rifle. Knowing that the victim needed help, Mrs. Guyer ignored her husband's warning and continued over to the

28

Campbells' driveway. Id. at 123–24. Her recollection of her interactions with Defendant was minimal, as her focus was on the victim, and her primary goal with Defendant was to get him to put the gun down.

Q: Could you describe that gun to the jury?

A: I cannot. I just know it was a big one. I don't know guns.

\*\*\*

Q: So you say you see him holding a big gun. Did you say anything to him?

A: I told him to put the fucking gun away, get it away. I just wanted him to put it away so I could help Tim.

Q: Did he say anything to you?

A: To me?

Q: Yes.

A: Not that I recall.

Q: Okay. Did you start getting closer to Tim?

A: Yes.

Q: At any point in time did you say anything else to Cole Campbell?

A: I told him to put the fucking gun away.

Q: And did Cole Campbell ever say anything to you as you're saying that? Did he respond?

A: Not that I recall.[25]

Q: What happens next?

A: He went into the house. I got a little tea towel throwed at me.

Q: You know who threw you that towel?

A: I cannot tell you.

Q: How big was this towel?

A: I don't know. Just a small one.

---

[25] On cross-examination, Mrs. Guyer did recall Defendant saying "can you help him" to her one time during the interaction. Id. at 131.

29

Q:     What do you do when you get this towel thrown toward you?

A:     Put it on Tim's chest.

Id. at 124–25. Mrs. Guyer observed holes in the victim's leg, arm, and chest, and a lot of blood. His face was gray and he had foam in his mouth. He was still alive, and looked directly at her when she said his name, but he was struggling to breathe. She used the towel to apply pressure to his chest until she realized she needed more help to aid the victim. Id.at 125–26

Q:     How did you get more help?

A:     I went and got my husband to go get Hillary [Skipper].

Q:     Why did you want your husband to go get Hillary?

A:     Because I was panicking on top of I needed more help.

Id. at 126.

Mr. Guyer got in his vehicle and went to get both Mrs. Skipper and the victim's brother, Dustin, to help. He went to Dustin's residence first. Id. at 95–96.

> Coming up the driveway and I'm blowing on the horn and Dustin sticks his out the window or out the door and I said, the neighbor just shot your brother, and just a blank stare. He looked at me and I had to say it again. I said, the neighbor just shot your brother. An then he said, all right, I'll be up. And then I go down and Hillary's driveway and then I get on the main driveway and Hillary comes running out and she asked me what I was doing and everything. I told her, I said, the neighbor shot your husband.

Id. at 96.

For Mrs. Skipper, the news came as a shock. She had not been concerned about her husband going up to confront Defendant about the speeding. The victim was angry, but far from out of control. "[H]e was a little bit upset but not like cussing and swearing and throwing things and rushing out. He was very—pretty calm actually." Id. at 61–62; see also id. at 83 (confirming that the victim was angry, but calm, on cross-examination). Their nine-year-old son had wanted to go along with the victim when he spoke to Defendant. The victim was fine with this, and was going to take the boy along, but Mrs. Skipper asked the boy to stay there

30

so she had help putting the groceries away. Id. at 61. Mrs. Skipper did not see the victim grab any weapons before heading out. Id. at 62.

Q:     What happens next?

A:     We're putting the groceries away and next thing I know our neighbor, which Tim always referred to as Kirby, it's Curtis, went up to my brother-in-law's house and then came flying down past my house, so I go out and like yelling at him like, what are you doing? You're way past my house and all he says is the neighbor shot Tim. So I ran into the house and threw my shoes back on. At this time by that time my brother-in-law had gotten down to me and they're trying to talk me into not going up because of him having a firearm.

Q:     Who had a firearm?

A:     Cole Campbell. And I didn't—just in reaction I went up anyway.

Id. at 62–63. Mrs. Skipper drove up in her own vehicle. She called her parents on the way to alert them to what had happened, because the boys were home alone and "I figured if the worst happened ... we would need them there." Id. at 63.

The victim was still alive when Mrs. Skipper arrived, but died soon after, despite the efforts of herself and others.

Q:     What happens when you get up to Cole Campbell's residence?

A:     Samantha [Guyer] waived me out, so I parked behind Tim's truck and went running up and when I rounded the vehicle there was a pool of blood on the ground and Tim was laying there gasping and foam was coming out of his mouth. Sam asked me what she needed to do and I asked her to go grab towels because we only had one tiny little towel. I then got down, tried to get him to respond. He looked—he moved his mouth like he was trying to say something to me and then his eyes rolled back in his head and I—I checked his wounds and I looked to seek if the bullets went through because if it goes through and through that's a good sign. I noticed that his leg was—the bone was sticking out and there's blood and he had a wound there. That was the side I checked to see if it had gone through. I could feel that he arm definitely was shattered. It was very—you could feel the bone move around in there. And then I proceeded to do CPR.

Q:     Are you trained in CPR?

31

A:     Yes.

Q:     How did you receive training in CPR?

A:     Through the Red Cross through work.

Q:     You are a licensed nurse?

A:     Yes.

Q:     How long did you attempt life-saving measures on your husband?

A:     Until the ambulance arrives.  It felt like forever.  I don't know a time still.

Q:     What happened when the ambulance arrived?

A:     They put him in the back of the ambulance, asked me to go up front.  I could hear them hook up the AED and it was flatlined.

Id. at 63–64.  Mrs. Guyer's testimony matched that of Mrs. Skipper in regard to Mrs. Skipper starting CPR soon after arrival.  She further noted that the individuals who tried to aid the victim before the ambulance arrived included herself, Mrs. Skipper, Dustin Skipper, and Defendant's mother.  Id. at 127, 133–34.

Mrs. Campbell called 911 just after the shooting happened.  The recording of the 911 call was played for the jury.  Id. at 173–77, 179–184.  In addition to state troopers, the 911 Center dispatched EMS personnel from Three Springs Ambulance.  Traci Rae Fleck, a volunteer emergency medical technician with Three Springs Ambulance, was part of the ambulance crew that responded.  She holds the rank of Captain for Three Springs Ambulance.  Per her testimony, the ambulance initially staged at the bottom of Springhill Drive, since law enforcement had not arrived.  After the victim's brother came down on an ATV and begged them to come up, the ambulance crew decided to risk it, and went up to the scene.  Id. at 187–89.  On arrival, Ms. Fleck was the first one out of the ambulance.

I directed [the crew] to get the stretcher.  We went over.  They were doing CPR on him and when we got the stretcher up to him, they just put him over on the stretcher and I did not ask no questions.  We just wanted to get out of there, went back, put him in the ambulance then.

32

Id. at 189. As the crew was getting the victim on the stretcher Ms. Fleck noticed a lot of blood and "fragments" on the ground around where he had been laying. Id. at 190.

After getting the victim in the back of the ambulance, Ms. Fleck had one crew member set up the AED while the other continued CPR. She then did a rapid assessment of the victim. He was not breathing and had no pulse. There was "a lot of blood" on and around him. When she checked his eyes, they were unreactive and devoid of life. When she went to take the boot off the victim's left foot to assess the leg injury, his entire lower leg detached from his body. She also noted that his right arm was shattered and there was a hole in his chest. Id. at 190–192. The crew continued CPR until instructed to stop by medical command. Id. at 190. Ms. Fleck did not find any weapons on or around the victim during her assessment and treatment of him. Id. at 192.

       c.   Testimony of Mrs. Campbell and Defendant

On April 3, 2022, Defendant lived at 8036 Campbell Circle with his wife, Brandy Campbell, his two daughters Ellie (then age four) and Autumn (then age two), and his stepson, David Nevins (then fourteen or fifteen years old). N.T., Day Three, at 25. Defendant had owned the home for about ten years, and had purchased it from his grandparents. Id. at 26.

At the time of the trial, Defendant and Mrs. Campbell had been married for five years, and Mrs. Campbell had lived with Defendant at the house on Campbell circle for seven years. N.T., Day One, at 135. On the day of the shooting, the family had gone to Mifflintown around 3:30 or 4:00 pm to pick up her son, David, from his father's house. (Mrs. Campbell shares custody of David with his father.) On their way back they stopped at the grocery store in Orbisonia, and had encountered Mrs. Skipper and one of the Skippers' sons as they were leaving the store. The two boys said hi to one another. Id. at 156. There was apparently no interaction between the adults, and the family went back home.

Q:     All right. No issues?

A:     No issues. We had went back home and I had asked [Defendant] to move the gun off the table because it was sitting

> on our table from the night prior. I started dinner and asked him to run down and get gas for the side-by-side so my son could get down to the bus stop the next morning.
>
> Q: Okay.
>
> A: He had moved the gun. I'm not sure to the hallway, the bedroom, somewhere in the back of the house. And then he left with the gas—the racing gas can in the back of our Dodge Journey to go down to the gas station to get gas.

Id. at 156. Mrs. Campbell testified that usually Defendant stored his guns in the gun cabinet in the living room. Id. at 151.

Mrs. Campbell's testimony revealed that the family had a high level of concern about anyone coming to their home, but particularly so with respect to the victim. The front door, which the victim came to, was always kept locked. Id. (in response to being asked whether Defendant could have locked the door when the victim came to it, she responded: "It is locked at all times."). When she heard the victim's truck approaching after Defendant returned from getting gas, she looked out the window, saw it was approaching their home, and took Ellie into the master bedroom with her. Id. at 157.

> Q: Why did you do that?
>
> A: Because my oldest daughter is afraid of anybody that came up our driveway. Ever since the first incident with the backhoe she has been afraid of him.
>
> Q: Afraid of Skipper?
>
> A: Yes.
>
> Q: How did you feel about Timothy Skipper?
>
> A: I felt a little uneasy at that point but when he beat on the door I felt really uneasy.

Id. At this time, the Campbells' youngest daughter was not with Mrs. Skipper and Ellie, but was instead in her own bedroom. Id.

Mrs. Campbell testified that she did not actually see what transpired between Defendant and the victim, but did hear it. She characterized the victim's knocking on the door as him "beating on the door," and then heard Defendant open

34

the door. "Whenever he opened the door Tim had yelled at my husband slow the fuck down. I have fucking kids." Id. at 159–160. She then heard Defendant tell the victim to "get the hell off his property" five times. Id. at 160. She also heard the victim say something about putting speed bumps in. Id. at 149. The next thing she heard was the first shot. She heard the sound of feet stumbling, and then heard the second and third shots. Id. at 161, 162. Once things were quiet Mrs. Campbell went out into the living room and saw the victim crawling out of the house. She got the phone and called 911. As she was on the phone with 911, Defendant asked her for a towel, which she got for him. Id. at 162–63. Defendant then headed outside and she stayed in the house. While Defendant was outside, she heard him yell "he was in my fucking house." Id. at 163. She noted that while all of this was occurring, her son was away from the house, having gone down to the bottom of Springhill Drive on the side-by-side to take the trash down. Id. at 164.

Turning to Defendant's testimony regarding the night of the shooting, he began with the same sequence of events as his wife. They had gone to Mifflintown to pick up his stepson David, returned, and Mrs. Campbell was making dinner. As she was doing so she asked him to run out and get gas for the side-by-side that David uses to get down to the school bus stop. N.T., Day Three, at 42. At this point, he claimed that the pistol later seen in the Kitchen video was not a firearm, but an Airsoft pistol that belonged to his stepson.[26] He testified that as he went outside to get the gas can he noticed the Airsoft pistol laying outside, so he shoved it in the pocked of his hooded sweatshirt with the intent of reprimanding the boy later for "leaving something expensive out." Id. He "[d]rove out the driveway like I normally do, doing 10, 15 [MPH]," reached the main road and went to the gas station without incident. Id.

On his return trip, Defendant met his stepson on Springhill Drive as the boy was coming down the hill on the side-by-side to take the garbage down to the dumpster at the entrance to the neighborhood. "I stopped and I put the window down, and I hold him, hey, when you get up to the house put your Airsoft pistol

---

[26] A type of low-powered air gun.

away. It's going to be on the table." Id. Defendant then continued up Springhill Drive, slowing for a rough section of potholes and shale before he reached the Skippers' property, and then accelerating back up to speed (but again, still only going "about 10, 15" MPH as he passed their property). Id. at 43.

Defendant testified that nothing seemed off until he parked, entered the house, and realized the victim had turned into his driveway.

> I had to use the bathroom. I had to take a leak. Was heading into the house. I pulled [my stepson's] Airsoft out, plopped it on the table, was going back the hallway. I could hear a loud truck and I happened—as I was passing my stepson's bedroom, I happened to look out the window and I saw Tim's truck coming down the road a decent rate of speed. Didn't raise any red flags at that moment because I know he goes over to the Guyers['] quite often. Continued into the master bedroom to go into the master bathroom.
>
> When I entered the master bathroom I realized he had turned in completely in behind our Dodge Journey. At this point I began to worry. It was raising all kind of red flags why he was coming up at a high rate of speed. So as I exited the bathroom, my AR was laying on the bed. I grabbed it. I passed the desk and I grabbed the magazine. I seated the magazine into the rifle and I'm walking and racked a round. I passed my—excuse me—I passed my wife with my oldest daughter Ellie. Ellie was already beginning—excuse me—to freak out. I told my wife I said, hey, just wait here. I'm going to go see what he wants.
>
> I proceeded to go out into the kitchen. I went to place the AR on a box, realized that it wasn't going to be the sturdiest and I figured the cat was going to step on it and knock it off balance. So I decided to make the decision to place it beside the door where I wanted it to be safe and sturdy when I heard pounding on the door. At this point, you know, my heart's racing a mile a minute but—
>
> *** [Defendant was asked why his heart was racing.]
>
> Just with previous encounters with him, knowing his history, short temper, just a million reasons. I was afraid for sure.

Id. at 43–44.

As soon as Defendant opened the door, the two men began to argue. After initially denying that he had been speeding, Defendant began ordering the victim

36

to leave. He also claimed to have become concerned that Defendant might be armed. He admitted to being angered by the victim's actions.

> A: I swung the door. I put my hand on it and he immediately jumped down my throat about speeding, saying I was going an excessive speed and I was caught off guard by that. So I started arguing back. I was like, you know, Tim, I was going 15 mile an hour past your house. You were going way faster than that. I was like, Tim, it was 15 mile an hour. He kept coming at me about it. He said he was going to put speed bumps in. You're fucking crazy. I said get the fuck off my property. He's like fuck you.
>
> Q: How was his demeanor? How did he appear to you?
>
> A: It was like lightning bolts. Like it was beyond pissed off. I told him to get the hell off my property, Tim. I said, get the fuck off my property because this continued. He said about speed bumps.
>
> Q: Did you point like that as well?
>
> A: **I was pointing. When I get angry or whatever I talk with my hands.** I kept telling him to get off my property, get the fuck off my property. I had noticed his hand was in his pocket and with seeing him with firearms before it made me feel very uneasy to the point that I didn't know what he even had in his pocket.

Id. at 45 (emphasis added).

Defendant told the victim to "get the hell off my property" repeatedly. "I probably told him at least three, four, five times." But the victim did not leave. Defendant believed "[h]e had no intention to leave." Id. at 46. Defendant then grabbed his rifle and the struggle started.

> I had told him to get the hell off my property. He was making me uneasy with his hand in his pocket. This was probably, like I said, the third, fourth—everything was happening so quick. He wasn't leaving. Hand in his pocket, I reached over. I grabbed my AR and I had it down. I told him I was like Tim, just get the fuck off my property. Like, pull your hand out of your pocket and keep it where I can see it. Get the hell of my property. As soon as you leave I'm calling the cops. I'm done with it.
>
> He looked at me, looked at the gun, looked at me in the eyes and he's like, I'll show you fucking crazy. He grabbed—reached down hold of

37

the barrel. He pulled the barrel up to his heart with his left hand. He grabbed my hood, my hoodie, with my right and he started pulling on it. The first thing that went through my head was I'm going out this door, so I braced. That threw me off balance and he slammed me backwards into the table, smacked my head off the lamp. I'm screaming at him to let go of the rifle, get out of the house, let go of the rifle, get out of the house.

We swing off. We get to about the midpoint. I finally get my traction. I was in smooth bottom western boots. We finally get stopped and he's got the rifle now from about his heart area down. I thought it was down way towards the floor or whatever. I could feel him pulling on my hood. I thought he was going to get his arm around me and start either trying to take me out, take the rifle or whatever he was going to do. So I made the decision at that point to pop the safety and squeeze a round. Gun went off. He went to his knees, drug me over with him because he had ahold of the hood and my gun. I felt the gun go free and gave it a yank.

\*\*\* [Defendant denied knowing that the first shot had hit the victim.]

I pulled the gun as much as I could so he couldn't get back ahold of it. I felt my hood go free. I knew at this point I needed to get some distance between me and him, so I started backtracking. As I'm bent over backtracking trying to get some space I told him—I'm yelling at him. I was yelling get your hands up, get your fucking hands up. When I got my space and I started bringing my head up, when I started bringing my head up, I got visual again on him. I saw his right hand was up like this and I thought to myself very quickly okay, this is done but I saw his other hand going right back down to his hoodie, his pocket area. As soon as I saw that hand going, I didn't wait and I fired two more rounds in rapid succession. Ultimately both struck but it was just a quick swing of the rifle up and I didn't use the sights or anything, was just a quick reaction. Everything was happening so fast.

Id. at 46–48. Defendant emphasized that the victim did not stop moving after the first shot. "From what appeared to me I lost visual on him. When I brought my head back up, it looked like he was going to attempt to get in his pocket." Id. at 48. His sense was that the victim's behavior only changed after the third shot. "He rolled after the third shot and then began crawling out of the house." Id. Defendant repeated his claim that the victim had put the barrel over his own heart.

Q: And did you shoot him again after that?

38

A:    No. He wasn't a threat.

Q:    Did you want to kill Tim Skipper that day?

A:    Absolutely not. The barrel was on his heart. I didn't want to kill him.

Id. at 48–49.

After the victim crawled outside, Defendant followed him to make sure he did not pull a gun and start shooting into the house. Id. at 49. But he also testified that he wanted to help the victim, that he asked the Guyers to do so, and he was still concerned that the victim was going to pull a gun out of his pocket.

So I followed—he crawled out of the house. I immediately popped the safety back on the rifle and I began to follow him out of the house. I was yelling at him to get down because I was going to attempt whatever first aid I could attempt. I'm not a paramedic but I know some basics. He continued to crawl away. He eventually collapsed. I was trying to figure out how to safely approach him without putting myself in anymore danger because he was laying on his arm that he was reaching into his pocket with.

So in that time I was trying to process that I heard Curtis Guyer. He started screaming over at me like you shot fuckin' Tim. You didn't have to shoot him, and I was like he was in my house. You know, he grabbed ahold of me and he tried to take my firearm. Like my family's in that fucking house. Samantha was yelling, too. I was trying to get her to come over. I knew she had medical training. I was like can you help him? Can you please come over here like and help? Curtis was yelling at her not to approach, that I was going to shoot them which I, you know, I'm yelling back at Curtis, I'm not going to shoot anybody. You're not forcing your way into my house. Like, come help him.

She finally does approach. I asked her—I was like, what do you need? And she's like a towel. Do you have a towel or a sheet or anything? I go back in the house. I guess I should say prior to that I believe I yelled at my wife to call 911 and then all this is happening. So I go back in, I'm yelling at [my wife] to get me a towel. She comes up, hands me one of our purple bath towels. I grabbed it from her. I go back outside. I give, you know, Samantha the towel. I'm like what else do you need? Tell me what you can do. She said, you've done fucking enough. It's a little blurry and fuzzy to this day, the adrenalin. It's one of my first adrenalin dumps.

Id. at 49–50. After that, Defendant locked himself in the house until PSP arrived. He kept the rifle with him in case anyone outside tried to come into the

39

house to retaliate. When PSP arrived he finally put it down. "I dropped the mag. I raked the live round out. I picked the live round up and I placed it back into the magazine. I locked the bolt back on the AR with the safety on." Id. at 51. Defendant placed the rifle on top of the box by the door and then met the three state troopers who had arrived outside. Id.

Defendant's testimony on direct examination also touched on his concerns regarding the victim generally. With respect to his statement in his text message to Trooper Brenneman that having an unidentified convicted-felon neighbor allegedly carry firearms made him "uneasy with the kids," Defendant stated: "So I'm a firearm advocate. If you can legally possess a firearm, I have no issue with that. I have no issue with felons. It's just felons with guns. They make me very uneasy and scared to be around." N.T., Day Three, at 36. He did not tie this to the victim specifically, but rather only convicted felons in general. Defendant also emphasized the rural nature of where he lived, terming it "Bumfuck Egypt," or "BFE," and noted that he had to drive past the Skippers' residence in order to get into and out of the neighborhood. Id. at 40. Finally, he emphasized that after the Skippers had moved in, he had posted his property against trespassing, noting with some pride the reflective sign at the bottom of Campbell Circle.

> Q: And who put that sign up?
>
> A: I ordered it and then I pounded it into the ground, so me.
>
> Q: And was it visibly—was it visible when you drove up to get up to that turn to your house to see?
>
> A: The picture depicts it blaring out. I can tell you when your headlights hit it, it comes back at you pretty bright and if it's in daylight you can sure well see it.

Id. at 37–38.

On cross-examination, Defendant admitted that he had not had many interactions with the victim, but emphasized his belief that both his fear of the victim and suspicion that the victim had a gun in his pocket were reasonable. But he could not provide an explanation for why he had not provided specific details regarding the incidents in which he claimed to have seen the victim armed with a

40

gun to any of the law enforcement officers he contacted, or to PSP generally. Id. at 55–63. In part, he claimed that it was because "I didn't feel like I was getting anywhere with them." Id. at 62. Defendant repeated that he was concerned about the victim, but also denied that he was "worried" about what the victim might do until he came to the Campbell residence the night of the shooting. Id. at 57, 63. He admitted that prior to the night of the shooting, the victim had never threatened him. Id. at 62–63. Defendant did not see anything when he drove past the Skippers' residence on the night of April 3, 2022, that caused him concern, and he denied ever having been confronted previously by the victim regarding speeding on Springhill Drive. Id. at 64–65. He did not seeing some sort of hand movement by the victim as he drove past, but was not concerned about it. Id. He agreed that it would have been appropriate for the victim to come up to the Campbell residence to talk to him about speeding, if he had done so "politely." Id. at 65–67.

Defendant claimed that he had not grabbed the rifle specifically because the victim came to his house, and that he had selected it because it was what he had at hand. He also expressed a general fear of strangers coming to his house.

Q: You knew he was coming to your house?

A: I did not know he was coming to my house until he turned in.

Q: And when he turned in, that's when you decided to go not only get a firearm but load a firearm?

A: **I don't answer that door without a firearm.**

Q: So if I would come to your house—

A: There would be a firearm by that door.

Q: Staged?

A: It typically would be a pistol but it would be on me. That was just there because it was the only firearm I had quick access to.

Q: So you have a general fear that anybody that comes to your residence is a threat to you?

A: **Strangers, yes.**

Q: A threat to your family?

A: **Have you seen the world today?**

41

Id. at 67 (emphasis added).

Asked about how he stored and managed his firearms generally, Defendant admitted that he had originally left the rifle on the dining table, and then had left it in the bedroom, despite the fact that there were young children in the house. He emphasized that the rifle was not loaded, and that the magazine (which was loaded) was sitting on the desk in the bedroom away from the rifle. He disagreed that the firearm should have been secured away from the children, and instead emphasized teaching kids about firearms and not to touch them. Id. at 68–69.

Q: I would think that if anytime somebody comes to your house as a stranger, that gun's loaded, you would be very cognizant of making sure that gun got put back so the two-year-old, the four-year-old or [your stepson] didn't touch it, correct?

A: That's why it wasn't by the door.

Id. at 68–69 (emphasis added).

Defendant claimed that the master bedroom door was usually locked to keep the kids out, but at that time it was unlocked. And regardless of the fact that the children's bedrooms were close by, he viewed the risk of having the unsecured firearm in the bedroom reasonable in light of the threat presented by strangers— the victim particularly so.

Q: Two-year-olds can be mischievous?

A: Sure.

Q: Four-year-olds don't always pay attention to you?

A: Sure.

Q: And you took a risk?

A: It's how I was raised.

Q: You load that firearm—you load that weapon and you immediately come out, correct?

A: From the bedroom.

Q: And I want to ask this question because I think it's extremely important. What were you afraid of right then and there?

A: **The unknown.**

42

Q:     The unknown?

A:     **The unknown. I don't know why he's there.**

Id. at 70–71 (emphasis added).

Defendant repeatedly stated that he thought the victim was a threat as soon as came up the driveway.

Q:     Was your family in jeopardy right then and there?

A:     Yes, absolutely.

Q:     So when you're approaching that doorway with that gun you're afraid?

A:     Yes.

Q:     You're afraid of Tim Skipper?

A:     **I'm afraid of Tim Skipper. I'm afraid of anything, anyone.**

Id. at 71 (emphasis added).

Despite constantly emphasizing his fear, Defendant could not provide a reasonable explanation for why he opened the door and engaged in an argument with the victim, instead of keeping the door locked and calling the police or immediately telling the victim to leave. He claimed that he had no choice but to open the door, as the victim could have been there for a reason other than to confront him.

Q:     And when you staged that rifle did you still have that same fear that he was going to harm you, kill you, kill your family, kidnap you?

A:     With not knowing why he was there, yes, absolutely.

Q:     Would it be fair to say that this period of time is nothing but speculation and conjecture on your part?

A:     I'm not a hundred percent sure what that means.

Q:     You didn't know what Tim Skipper was there for, correct?

A:     Well, opening the door, no. As far as I knew he—

Q:     Because you did nothing wrong going past his house, correct?

A:     **Correct. For all I knew my stepson wrecked his side-by-side.**

43

Q:     You had the option of not opening that door?

A:     No.

Q:     You didn't have that option?

A:     **And leave my stepson outside with a maniac.**

\*\*\*

Q:     When you went back the hallway, according to you because you had to use the bathroom, then you hear the vehicle. Did you tell your wife immediately call the police?

A:     No. I didn't know he was coming to my house.

Q:     When he pulled into the driveway and you knew that he was there, did you tell your wife call the police. He's here?

A:     I didn't know why he was there.

Q:     He's trespassing according to you.

A:     Yes, he is trespassing but again I was worried—

Q:     Go ahead.

A:     **Again I was worried that maybe something happened to my stepson on top of everything else. Maybe he wrecked the side-by-side, maybe one of our animals got out.**

Q:     Again you['re] speculating. And Tim Skipper, you know him so well, that if one of your animals got out he would be the guy to come and tell you, correct?

A:     I don't know if he would or not. I would hope he would.

Id. at 72–73, 75 (emphasis added). Despite testifying that he could not leave his stepson outside with the victim, as the victim was "a maniac," Defendant incongruously testified that he had no concerns with allowing his stepson to drive the side-by-side past the Skippers' residence, because his stepson "had instructions to never stop." Id. at 74.

Finally, Defendant was unable to provide a specific reason why he felt the need to grab the rifle and point it out the door at the victim, or why he thought that the victim was reaching for a gun in his pocket on the night of the shooting. Instead, Defendant kept falling back on things like the fact that the victim did not

44

immediately leave when he was ordered to, the victim was angry, the victim had his hand in or near his pocket, and that he had allegedly seen the victim with a pistol on a previous occasion.

Q:     When you opened that door, what were you afraid of?

A:     Originally when I opened the door at that point with him standing there and glaring at me and then besides the fact pounding on my door, swinging open and him glaring at me and then immediately jumping on me that I was speeding when I was not speeding.

Q:     And you couldn't just have an argument?

A:     We did have an argument.

Q:     And you're the one that introduced the deadly weapon. Is that fair?

A:     I told him to leave my property four to five times, to get the hell off my property.

Q:     And you could just simply at that point in time instead of reaching for the AR shut the door?

A:     Again my son's outside.

***

Q:     He came to your doorway and told you you were going too fast?

A:     Correct.

Q:     He told you he was worried about his kids?

A:     He never mentioned his kids.

Q:     And he told you if you didn't stop he was putting speed bumps in.

A:     He mentioned speed bumps, yes, and I had no issue with this.

Q:     During that 24 second period of conversation he never brandished a weapon?

A:     His hand was in his pocket that I believe had a pistol.

*** [Commonwealth's Exhibit 129, a still picture taken from the Doorbell Camera, was discussed at sidebar.]

45

Q:     And I just want to be clear. What made you uneasy? What made you frightened? What made you scared with Tim Skipper standing at your door like this? [Demonstrates hand in pocket.]

A:     His hand was in his pocket. I don't know what's in his pocket.

Q:     Was it like this?

A:     I don't recall. I know it was in his pocket.

Q:     But if it's—if it was like this, that's what scared you to the point you introduced deadly force?

A:     Not knowing what was in his pocket, his demeanor, prior encounters, yes.

Q:     I'm going to show you what's marked as Commonwealth's Exhibit 129 and ask you to take a look at that Exhibit.

A:     Okay.

Q:     Would you agree with me that's a still shot of Tim Skipper on the day in question when he was talking to you?

A:     Yes.

Q:     You say that—does that appear to be a threatening manner?

A:     At that point in time, no.

*** [Commonwealth's Exhibit 129 was admitted and published to the jury.]

Q:     You pointed the gun at Mr. Skipper?

A:     Down and right—well, down and to my left.

*** [Discussion of the distance between the Defendant and the victim when the gun was pointed.]

Q:     When you did that he reacted?

A:     Yes. He grabbed ahold of the barrel when I told him—when I reached and picked up the rifle, I had it down. I told him you need to leave. You're trespassing and you need to leave, Tim. He grabbed the barrel.

Q:     And is it your belief that you had the right to kill him, shoot him, because he was on your front doorstep?

46

A: When he wasn't leaving and continuing to reach around in pockets, I was in fear for my life.

Q: Fear for your life.

A: Especially when he grabbed hold of the rifle.

Id. at 73, 76, 77–79. Defendant focused almost exclusively on the fact that the victim had grabbed the rifle, and had come into his home after grabbing it, as the justification for escalating to deadly force. He also reiterated that he did not know that the first shot had hit the victim. Defendant disagreed that the leg wound negated the victim as a threat, because "his hands and arms still functioned." Id. at 79–80. Defendant apparently did not view aiming the rifle at the victim as a threat or form of deadly force; he instead focused on everything that happened after he pointed the rifle at the victim.

Q: Tim never personally threatened you with bodily injury?

A: That I'm aware of, no.

Q: Tim never threatened to kill you?

A: He did that night.

Q: He did that night?

A: Yeah.

Q: What did he say?

A: **He didn't say anything. He tried to take my firearm**.

Q: After you introduced it.

A: After he was reaching, had his hand in his pocket with unknown and I asked him to continue to leave and he wouldn't leave. I presented my firearm, again instructing him to leave and instead of putting his hands up or doing anything, walking away, leaving at that point, he took ahold of the rifle.

Q: So this is all Tim Skipper's fault that you had to shoot and kill him on the night of this incident? It's his fault, right?

A: In my opinion, yes.

Id. at 80–81 (emphasis added).

47

### 3. Evidence obtained as a result of the Commonwealth's criminal investigation.

Stated briefly, all of the physical and forensic evidence obtained by the Commonwealth matched with the video evidence that was admitted at trial, and corroborated the testimony of the witnesses with respect to the physical events that occurred. Further, Defendant's testimony regarding his cooperation with the investigating officers (such as showing them the videos on his phone) matched with the testimony of the responding officers. The key witnesses and testimony for purposes of appeal are as follows:

a. Trooper Joshua Kleinfelter

Trooper Kleinfelter was both one of the first troopers on scene in response to Mrs. Campbell's 911 call and the first witness to testify for the Commonwealth. He generally testified as to the people who were on scene when he arrived, the information that troopers were provided by the Defendant, that Defendant and his family members were cooperative, and that Defendant played the videos for the troopers. N.T., Day One, at 12–41. Specific matters testified to by Trooper Kleinfelter included that when he arrived on scene, the victim was already in the back of the ambulance; he observed a pool of blood, dentures, glasses, and a cell phone in the location where the victim had collapsed; that upon entering the Campbells' residence he observed what he believed to be bone fragments on the floor; how he located and secured the AR-15 rifle used by Defendant; and that he maintained the crime scene entry log while members of the PSP forensic services unit were documenting the scene. Id. at 13, 14, 15, 17–18, and 19–20. The Commonwealth also used Trooper Kleinfelter's testimony to introduce the Kitchen video from the Surveillance System and play it for the jury for the first time. Id.at 21–30.

b. Trooper Cody Hollibaugh

Trooper Hollibaugh testified in regard to the search warrants that were obtained for Defendant's residence and his body, the evidence preservation requests that were sent to AT&T and Verizon regarding cell phone records, and the evidence preservation requests that were sent to Facebook. With respect to

48

Facebook, one preservation request was sent with respect to Defendant's account, and two preservation requests were sent with respect to the victim's two accounts. N.T., Day Two, at 3–8. Trooper Hollibaugh then identified the records that were received from Facebook with respect to Defendant's account. Id. at 9–11.

c. Corporal Travis Garner

Corporal Garner was assigned to the forensic services unit on the night of the shooting. He took extensive photographs of the crime scene, including the area where the victim collapsed in the driveway, the area of the stoop outside the entrance door to the Campbells' residence, and the kitchen and dining area of the Campbell residence where the physical confrontation and shooting occurred. He also searched and photographed the victim's silver Ford pickup truck, the victim's clothing, and took photographs of the victim's body and wounds in the back of the ambulance. He began with the victim's body in the ambulance. He initially observed the victim to have a gunshot wound to the left leg below the knee, a gunshot wound to his right arm below the elbow, and another gunshot wound to the right arm above the elbow. Id. at 15. The pictures taken in the back of the ambulance were admitted as Commonwealth's Exhibits 14–25. As he was taking these photographs he noted that the victim also had a gunshot wound to his right torso. Id. at 20. Thirteen items of evidence were collected from the victim's body, consisting mostly of his clothing. Id. at 15.

Trooper Garner then photographed and searched the victim's pickup truck. No evidence was collected from the truck. This search and these photographs, which were admitted as Commonwealth's Exhibits 26–35, were notable for what was not found. That is, no firearms or other weapons of any kind. Id. at 22–27.

Moving to the exterior of the Campbells' residence, this area was documented in Commonwealth's Exhibits 36–53. At the front of Defendant's Dodge Journey SUV, Trooper Hollibaugh documented a pool of blood, a purple towel, glasses, a cell phone, and dentures. The glasses, cell phone, and dentures belonged to the victim. Trooper Hollibaugh also photographed the Doorbell Camera. Id. at 28–34.

49

Commonwealth's Exhibits 54–61 were additional photographs of the area and items depicted in Exhibits 36–53. These photographs included evidence markers for identification, and showed how Trooper Hollibaugh collected samples of the suspected blood for analysis. No firearms, knives, or other weapons were found outside of the residence. Id.at 35–39.

Commonwealth's Exhibits 62–81 are photographs from the interior of the Campbells' residence. Id. at 39. Items discovered and photographed included a pool of blood on the floor just inside the door; the "WE DON'T CALL 911" sign; a spent shell casing found lying on top of a black plastic garbage bag that was on the floor near the wall; a second spent shell casing found on the floor near the wall and the cardboard box that Defendant originally rested the rifle on; and the surveillance camera that recorded the shooting. Id.at 41–47.

As with the exterior, Trooper Hollibaugh took an additional set of photographs of the interior with evidence markers for identification, and to show how the evidence was collected. These were admitted as Commonwealth's Exhibits 82–100. A sample was collected from the pool of blood on the floor. The two shell casings that were shown in the first batch of pictures from inside the residence were collected. Trooper Hollibaugh then located the third shell casing, which was located under a table after the FSU troopers moved it. Each of the shell casings was caliber .223, consistent with the chambering of the rifle used by Defendant. Trooper Hollibaugh also photographed the DVR router for the Surveillance System, which was collected and entered into evidence. Id. at 49–54. No other shell casings were recovered, and the only firearm that was located and seized as evidence was Defendant's rifle. Id. at 54–55.

Commonwealth's Exhibit 101 is a picture of the magazine from Defendant's rifle, which contained twenty-seven live rounds of .223 ammunition. Id. at 55.

Finally, Trooper Hollibaugh attended the autopsy on the victim's body that was conducted on April 5, 2022. He took seventy-five photographs during the autopsy, and collected the victim's underwear, a vial of the victim's blood, and two bullet fragments that were recovered from the victim's body as evidence. Id. at 59–60.

50

d.   Corporal Frank H. Gaus, Jr.

Corporal Gaus, recently retired at the time of trial, worked as a collision analysis and reconstruction specialist for PSP.  He responded to the scene to take detailed measurements of the pertinent aspects of the scene and the locations of the evidence that was collected.  He then prepared drawings that were shown to the jury noting the layout of the scene and where the evidence was discovered.  He also took photographs of the "no trespassing" sign at the entrance to Campbell Circle.  Id. at 80–93.

e.   Lieutenant Matthew J. Bonin

Lieutenant Bonin is the coordinator of the cellular analysis technicians unit for PSP.  He testified in regard to three videos that were extracted from Defendant's cell phone, including the video from the Doorbell Camera, and how he prepared the video from the Doorbell Camera for presentation to the jury.  Id. at 102–109.

f.   Dr. Harry N. Kamerow

Dr. Kamerow is a pathologist, and performed the autopsy on the victim's body.  He was admitted as an expert in the field of forensic pathology.  Id. at 111–14.  Dr. Kamerow testified remotely.

The autopsy was performed on April 5, 2022, at Mount Nittany Medical Center.  The victim weighed two hundred twenty pounds and was six feet, one inch tall.  Initial external examination showed a gunshot entrance wound on the right upper arm, traveling right to left, a gunshot wound to the right forearm, and a gunshot wound to the left lower leg.  There was also a contusion of the mid-upper chest and a contusion of the left upper chest.  Id. at 118–19.

Dr. Kamerow then used Commonwealth's Exhibits 104–108 to explain the wounds to the jury.  Going through the three wounds in the order in which the shots had been fired, the first wound was to the victim's left lower leg.  This was a near-contact wound, meaning the muzzle of the gun was close to the leg, and showed both an entrance wound and an exit wound.  The bullet fractured both bones of the lower leg (the tibia and fibula), and inflicted a severe injury.  Dr. Kamerow opined that the victim would no longer be able to put any weight on his

51

left leg after the gunshot. "[H]is leg would not work. If he [tried to put weight on it]—first of all, you would have horrible pain which obviously that wound is associated with but in addition the bones are comminuted. No, they would buckle." Id. at 127.

The second shot, to the victim's right forearm, fractured both the radius and ulna, and left an open-fracture wound. Id. at 129.

The third shot first hit the outer surface of the victim's right upper arm, traveling right to left. It traveled completely through the upper arm and then entered the victim's chest in the right armpit. After it entered the victim's chest the bullet struck the victim's ribs, fracturing ribs R-5 and R-6. After striking the ribs the bullet spilt into two main fragments. One fragment tunneled upward through the chest wall exited the victim's right breast. The second fragment continued through the victim's chest from right to left. That fragment went through two segments of the victim's right lung, causing bleeding from the lung and blood to fill the right pleural cavity. The damage to the right lung caused massive hemorrhaging; Dr. Kamerow found two thousand cubic centimeters (two liters) of blood in the victim's right pleural cavity. This meant that the third shot was the fatal shot. "[E]ven if you're a healthy adult male or adult female, 2000 cc's acutely lost is certainly enough to end your life." Id. at 120–21, 122–25, 129–30.

Dr. Kamerow ran a toxicological analysis on the victim's blood, and found the presence of caffeine and nicotine. There were no controlled substances present. Id. at 127–28.

Dr. Kamerow confirmed that the victim could have survived the first shot if he had received prompt first aid to control the bleeding. Id. at 131 (after explaining the issues involved; "[T]he answer to your question is if somebody were there and would put a tourniquet around his leg, he would live.").

g. Corporal Joseph D. Horton

Corporal Horton is a forensic firearm and toolmark examiner, and testified as an expert in that field. Corporal Horton identified the firearm used by Defendant as a Windham Weaponry Model WW-15 semiautomatic rifle, serial number WW 028027. He explained the operation of the rifle to the jury, and then

testified as to his examination of the rifle. The rifle was in good condition and capable of firing caliber .223 Remington ammunition. It was not susceptible to firing in shock and drop tests and had an average trigger pull weight of six pounds. The magazine held thirty rounds of ammunition. Comparison of the fired cartridge cases collected from the scene against cartridge cases fired through the rifle during testing confirmed that the collected cases were fired from the Defendant's rifle. Id. at 140–152.

### h. Trooper Christopher Bourne

Trooper Bourne is a criminal investigator assigned to the PSP Huntingdon station, and was the lead investigator. He primarily testified about his limited interview of Defendant at the PSP Huntingdon station on the night of the shooting, which interview occurred with counsel present, and the videos that were obtained from Defendant's surveillance systems. He noted that the Doorbell Camera video was downloaded from Defendant's cell phone, and (as discussed above) the Surveillance System videos were obtained from the Amcrest DVR router. The Kitchen video was again played for the jury during Trooper Bourne's testimony, and his testimony also included the playing of the Fence Side video and the Doorbell Camera video. Finally, Trooper Bourne testified as to the Facebook Messenger texts between Defendant and Joey Allen that were obtained from Defendant's Facebook account. Id. at 168–192.

### B. Defendant's Issue No. 3(a): Failure to Grant Acquittal on All Counts

The Court begins by noting that while Defendant casts this claim as a challenge to the denial of his motion for acquittal, it is properly characterized as a sufficiency of the evidence claim, as it focuses on whether the Commonwealth met its burden with respect to disproving self-defense. The standard for review of sufficiency of the evidence claims is well established.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that

53

the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Jones, 273 A.3d 452, 457–588 (Pa. Super. 2021) (cleaned up).

The right to self-defense and the limitations thereon are set forth in 18 Pa. C.S. § 505. Pertinent here are the following provisions:

(a) Use of force justifiable for protection of the person.--The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

(b) Limitations on justifying necessity for use of force.--

(1) The use of force is not justifiable under this section:

\*\*\*

(ii) to resist force used by the occupier or possessor of property or by another person on his behalf, where the actor knows that the person using the force is doing so under a claim of right to protect the property, except that this limitation shall not apply if:

\*\*\*

(C) the actor believes that such force is necessary to protect himself against death or serious bodily injury.

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of

54

work by another person whose place of work the actor knows it to be.

(2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2) The presumption set forth in paragraph (2.1) does not apply if:

\*\*\*

(iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or

\*\*\*

(2.5) Unless one of the exceptions under paragraph (2.2) applies, a person who unlawfully and by force enters or attempts to enter an actor's dwelling, residence or occupied vehicle or removes or attempts to remove another against that other's will from the actor's dwelling, residence or occupied vehicle is presumed to be doing so with the intent to commit:

(i) an act resulting in death or serious bodily injury; or

(ii) kidnapping or sexual intercourse by force or threat.

\*\*\*

(3) Except as otherwise required by this subsection, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do or abstaining from any lawful action.

\*\*\*

(d) Definition.--As used in this section, the term "criminal activity" means conduct which is a misdemeanor or felony, is not justifiable under this chapter and is related to the confrontation between an actor and the person against whom force is used.

Distilled to their essence, "the elements of a claim of self-defense [under 18 Pa. C.S. § 505] are that the individual (1) reasonably believed that force was necessary to protect himself against death or serious bodily injury; (2) was free from fault in provoking the use of force against him; and (3) did not violate any duty to retreat." Commonwealth v. Miller, 172 A.3d 632, 640 (Pa. Super. 2017). The first element has two further elements:

> The requirement that the defendant be operating under the reasonable belief that he is in imminent danger of death, great bodily harm or some felony, involves two elements. First, the defendant in fact must have acted out of an honest, bona fide belief that he was in imminent danger. Second, the belief must be reasonable in light of the facts as they appeared to him. The first element is entirely subjective; the second, clearly objective.

Commonwealth v. Light, 458 Pa. 328, 334 (1974) (cleaned up). "The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense." Jones, 273 A.3d at 458 (citations omitted).

It is black letter law that a defendant does not have to prove that he acted in self-defense. Rather, all he must do is establish that there is "some evidence, from whatever source, to justify such a finding," which then puts the question of self-defense properly before the jury. Commonwealth v. Black, 474 Pa. 47, 53 (1977) (citations omitted). Once he has done so, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not in fact acting in self-defense." Id. (citations omitted). This is not an insurmountable obstacle, as all the Commonwealth must do is disprove **one** of the three elements of self-defense in order to gain a conviction. Jones, 273 A.3d at 458 ("Where the defendant has introduced evidence of self-defense, the burden is on the Commonwealth to

56

disprove the self-defense claim beyond a reasonable doubt by proving that at least one of those three elements is absent.") (citations omitted).

Defendant was brought to trial on three charges: (1) criminal homicide, first-degree murder; (2) aggravated assault, causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; and (3) aggravated assault, intentionally or knowingly causes bodily injury to another with a deadly weapon.[27] On Count 1, the Court instructed the jury not only on first-degree murder, but also on the lesser-included offenses of third-degree murder[28] and voluntary manslaughter.[29] Incorporated into the homicide instructions were detailed instructions on self-defense. On Count 2, the Court instructed the jury not only on aggravated assault under 18 Pa. C.S. § 2702(a)(1), but also the lesser-included offense of simple assault under 18 Pa. C.S. § 2701(a)(1). No lesser-included offense was presented for Count 3. The instructions for both Count 2 and Count 3 specified that the defense of self-defense applied to those counts in the same manner as it had been instructed for Count 1. See N.T., Trial, Oct. 20, 2023 ("Day Four"), at 75–94. The Court provided the jury with a written copy of the charge-specific instructions for use during deliberations due to their complexity. Id. at 75–76. On Count 1, the jury rejected the Commonwealth's arguments for murder, and instead found Defendant guilty of voluntary manslaughter. The jury found the Defendant guilty as charged on Counts 2 and 3.

The evidence presented at trial established the order of the shots that were fired, the places that they struck the victim, and the injuries that resulted. The first shot fired, which struck the victim's leg and was not fatal, was the basis of the aggravated assault conviction on Count 2. The second shot fired, which struck the victim's right forearm but was aimed at the victim's torso, was also not fatal. The third shot fired, which struck the victim's right upper arm and passed through into

---

[27] 18 Pa. C.S. §§ 2502(a), 2702(a)(1), and 2702(a)(4), respectively.

[28] 18 Pa. C.S. §2502(c).

[29] 18 Pa. C.S. § 2503.

his chest, had likewise been aimed at the victim's torso and was fatal. The second and third shots were the basis of the aggravated assault conviction on Count 3 and the voluntary manslaughter conviction on Count 1. Defendant made it clear in his testimony that his decision to introduce the rifle into the verbal argument at the door, and his decision to fire the first shot, were separate from his decision to fire the second and third shots. He also made it clear that he made a conscious decision to fire two shots, and not one, while the victim was on his knees after the first shot. This was corroborated by the Kitchen video.

The question of whether Defendant had a duty to retreat, while included in the jury instructions on self-defense, was not placed in issue at trial. This leaves only the "lack of provocation" and "reasonable belief" elements of self-defense for analysis. The Court will first address Defendant's claim that his generalized fear of the victim was reasonable and justified his use of deadly force, because if this had not been overcome by the Commonwealth, it would flow across all three convictions. The Court will then address each of the shots, and the resulting convictions, in the order in which they occurred.

### 1. The evidence was sufficient to establish that Defendant's generalized fear of the victim was not reasonable.

Defendant emphasized, many times, both: (i) his belief that **anyone** other than a friend or family member who came to his front door was a threat to him and his family; and (ii) his general belief that the victim was a threat to him and his family simply by virtue of the victim's mere presence in the neighborhood. The first belief is objectively unreasonable. While situations do occur in which people are attacked by strangers who come to their front door, such attacks are fortunately rare, and the vast majority of people do not answer knocks at their front door with a loaded firearm staged for immediate use, ready to kill their unknown visitor. As for the second belief, there was more than sufficient evidence on which the jury could find that this too was unreasonable.

Looking first to the testimony from Defendant, Mrs. Campbell, and Mr. Quarry regarding instances in which the victim was alleged to have been

58

armed, there were many aspects on which the jury could reasonably find that their testimony was not credible. The instances of the Defendant and Mrs. Campbell allegedly seeing the victim present on his own property with a pistol in a holster on his hip were remarkably identical (i.e., potentially agreed upon and rehearsed). Defendant's testimony contained a contradiction that showed that he was trying to weight the facts in his favor. When Defendant testified on direct examination about having seen a pistol in the victim's possession during the snowplowing incident, he said that it was merely on the seat between the victim and his brother. But when asked about it again on cross-examination, Defendant changed his story so that it was under the victim's leg. The portion of Mr. Quarry's testimony regarding the presence of a firearm also came across as potentially rehearsed (such as the alleged dramatic sweeping aside of the jacket to reveal the pistol), and it was rather incongruent that he was not able to identify the pistol he saw with any specificity (beyond a generic, common type), but yet used the not-commonly known term "wheel gun" to refer to a revolver.

Turning to Defendant's testimony regarding his other reasons for fearing the victim prior to the night of the shooting, this testimony had multiple contradictions that bore upon both its credibility and the reasonableness of Defendant's expressed beliefs. Defendant claimed to be just fine with people owning and possessing firearms, and to be just fine with people who are convicted felons, but to suddenly become "very uneasy and scared" by any combination of the two, regardless of the specific facts of the situation.[30] Defendant referred to the victim as a "maniac" in regard to the thought of his stepson being outside when the victim was around, but yet had no qualms about having his stepson drive up and down Springhill Drive on the side-by-side on his own, regularly going past the Skippers' residence at least twice a day. And Defendant's characterizations of the victim's anger during the snowplowing incident ("shooting lightning bolts") came

---

[30] The Court does not advocate for convicted felons to own or possess firearms, but rather only identifies that not all situations in which a convicted felon—even one who committed a violent offense—possesses a firearm presents a clear and imminent danger to innocent persons.

off as embellished, particularly when compared to his demeanor during the prior incident with the backhoe.

    **2. The evidence was sufficient to disprove Defendant's claim of self-defense as to Count 2 because the Commonwealth established that Defendant provoked the use of force against himself, or, alternately, that Defendant's belief that an attack with a firearm was imminent was not reasonable.**

One of the Commonwealth's theories of the case with respect to first-degree murder was that Defendant, by introducing the rifle into the verbal argument between himself and the victim and pointing it at the victim, provoked the victim to use physical force against him. Had the jury found Defendant guilty of first-degree murder on this basis, the sum total of Defendant's actions on the night of the shooting would have constituted a single criminal act, as this would have negated his self-defense claim on that count. But the Commonwealth also proceeded on first-degree murder on the theory that the first shot, and the second and third shots, were separate criminal acts, and that Defendant's actions during the two-second pause between the first shot and the second and third shots demonstrated both intent and premeditation. While the jury rejected the Commonwealth's arguments for first-degree murder, this does not mean that they were required to reject the Commonwealth's provocation argument with respect to the aggravated assault charged at Count 2. The first shot was fired at the culmination of the physical confrontation that resulted after Defendant grabbed his rifle and pointed it at the victim, whereas the second and third shots were fired after Defendant believed that the victim was reaching for a gun in his pocket while kneeling on the floor.

There was sufficient evidence for the jury to find that Defendant was angry about being confronted by the victim about his speed driving past the Skippers' residence, angry at the victim for being present on Defendant's property (which he was clearly very possessive of and believed constituted trespassing), and, having not received instant compliance from the victim in response to his order that the victim leave the property, Defendant decided to threaten the victim with deadly

60

force by grabbing the rifle and aiming at him. Following such evidence to its logical conclusion, Defendant did not obtain the result that he anticipated—the victim instantly becoming fearful and compliant at the sight of the rifle. Instead, the victim, confronted with an angry, screaming individual pointing a rifle at him at close range, took action that was arguably justifiable in his own self-defense. He took hold of the rifle barrel, pushed it down toward the ground so that it was not aimed at either himself or Defendant, and charged at Defendant, grabbing Defendant's hooded sweatshirt and attempting to both keep physical control of Defendant and prevent him from bringing the rifle to bear. Defendant, realizing he was potentially going to be physically outmatched, then fired the first shot at the earliest opportunity. This conclusion is supported by Defendant's testimony that he was caught off guard by the victim's actions and that the early stages of the physical confrontation happened "so fast" that it took him a moment to come up with a way to counter it. It is also supported by the fact that the Kitchen video does not support Defendant's claim that when faced with the rifle, the victim first looked at the barrel, looked at Defendant and said "I'll show you fucking crazy," and then took hold of the barrel and aimed it at his own heart before pushing it downward and charging forward at him. The video instead shows the victim grabbing the rifle barrel and pushing it downward as soon as Defendant points it at him. On this evidence, the jury could find that the Commonwealth had proved beyond a reasonable doubt that Defendant provoked the victim's use of force against him, negating his self-defense claim.

This is not the only way in which the jury could find that the Commonwealth disproved Defendant's claim of self-defense, however. Defendant's claim at trial was that he was afraid that the victim was armed with a handgun, and either was preparing to draw that handgun and shoot him, or "could" draw that handgun and shoot him, and that this lead him to grab his rifle, ultimately leading to the physical confrontation and the firing of the first shot. He based this on his characterization of the degree of the victim's anger, his claim that he and other members of his family had previously seen the victim armed with a handgun, and that the victim had his hand in his pocket as the two men were

61

arguing at the door. But, just as with the snowplowing incident, Defendant's characterization of the victim's level of anger ("It was like lightning bolts. Like it was beyond pissed off.") came off as embellished. It also did not match with either the Kitchen video or the Doorbell Camera video. Those videos show the victim was angry and gesturing, but not standing in a position that suggested a physical attack was imminent or so angry that he was on the verge of losing control. It is also borne out by the snippets of audio from the Doorbell Camera, in which the victim comes across as angry, but in control. And even assuming, *arguendo*, that the testimony of the victim having been seen with a firearm on prior occasions was true, that evidence did not support Defendant's claim that his belief that the victim was both armed and about to draw a firearm on the night of April 3, 2022, was reasonable. The testimony was consistent that on the occasions on which the victim had a firearm on his person, it was a handgun in a holster worn on his belt, on his right side. Presumably, such a handgun would be too large to be concealed in the front pocket of a pair of jeans, as it would have had to have been large enough to be seen clearly by Defendant on the victim's belt while driving past the victim's residence at a distance of thirty yards away.[31] And the Doorbell Camera neither shows a bulge in pocket that the victim's hand is in nor the victim placing his hand in his pocket like he is reaching for something. Further, Defendant was clear that his belief was that the victim was **possibly** armed, not that the victim was **actually** armed.[32] Thus, there was sufficient evidence for the jury to find that the Commonwealth had disproven Defendant's belief that his use of deadly force was justified was reasonable even on the basis that the victim could have been armed, again negating Defendant's self-defense claim.[33]

It must also be briefly noted here that Defendant's testimony that he had "no choice" but to open the door when the victim "pounded" on it, and had to grab his rifle instead of simply closing the door, are contradicted by Defendant's own

---

[31] N.T., Day Three, at 60.

[32] Id. at 71.

[33] See further discussion regarding unreasonable belief/imperfect self-defense in regard to Counts 1 and 3, below.

62

testimony and the video evidence, which further supports a general finding that Defendant's belief that his threat and use of deadly force was justified was, in fact, unreasonable. Defendant claimed that he had to open the door to find out why the victim was there in order to find out if his stepson had wrecked on the side-by-side. But Defendant had recently met his stepson on Springhill Drive just below the Skippers' residence, as his stepson was headed down to the bottom of the hill to drop off the garbage, and the victim arrived at the Campbells' driveway a mere thirty-three seconds after Defendant. This means that there was no possibility that the victim could have encountered Defendant's stepson on Springhill Drive (the stepson was still headed downhill, away from the Skippers' residence), and no realistic possibility that the victim had somehow discovered that the stepson had wrecked, assessed the situation, and then proceeded up to the Campbells' residence before knocking on Defendant's door.

3. **The evidence was sufficient to disprove Defendant's claim of self-defense as to Counts 1 and 3 because the Commonwealth established that Defendant's belief that an attack with a firearm was imminent was not reasonable**

Looking again at the three elements of a valid self-defense claim and the verdicts handed down by the jury, only the second element—whether Defendant's belief that his use of deadly force was justified was reasonable—was truly in issue for these counts. The physical confrontation between the victim and Defendant was over at this point in the incident, and thus provocation was not a consideration. And, as noted above, duty to retreat was not a consideration.

While the voluntary manslaughter instruction provided to the jury on Count 1 included both "heat of passion" under 18 Pa. C.S. § 2503(a)(1) and "unreasonable belief killing justifiable" under § 2503(b), there was there was not sufficient evidence to support a "heat of passion" conviction. It was therefore clear that the jury found Defendant guilty on the basis of "unreasonable belief"; i.e., that at the time of the killing, Defendant actually believed that the killing was justified under 18 Pa. C.S. § 505, but his belief was unreasonable (also sometimes referred to as "imperfect self-defense"). As set forth in Commonwealth v. Jones:

63

> If the Commonwealth proves that the defendant's belief that deadly force was necessary was unreasonable but does not disprove that the defendant genuinely believed that he was in imminent danger that required deadly force and does not disprove either of the other elements of self-defense, the defendant may be found guilty only of voluntary manslaughter under the defense of imperfect self-defense.

237 A.3d at 458 (citations omitted).

As noted above, Defendant testified that after he backed up and "regained visual" on the victim, he decided to fire two more shots in quick succession. His stated reason for doing so was that while he observed that the victim's right hand was up and held in front of his chest, the victim's left hand was down by his side, and he believed the victim was again reaching for his pocket and possibly going to draw a gun on Defendant. As an initial matter, the same facts that establish that Defendant's belief that the victim was armed and going for a gun while standing at the door was unreasonable also establish that his belief that the victim was going for a gun at this point in time was unreasonable. But there are additional, and separately significant, facts that support this conclusion with regard to the second and third shots.

The Kitchen video shows that, just before the second shot was fired, while the victim's left hand was down by his side, he was not reaching toward his pocket. Instead, it was simply down by his left thigh. Further, the victim's overall posture is not one that indicates an imminent attack, but one that indicates submissiveness. As the second shot is being fired the victim is both raising his right hand as though to try to protect himself and already starting to turn his body to the left, toward the door, to leave the house. At the point in time at which the third shot struck his right upper arm and traveled laterally into his chest it was not because the force of the second shot hitting his arm spun him around, but because his body was already turning in that direction. Had Defendant truly taken the time to assess what was occurring he would have realized this. But he did not. Instead, he only paused for just over a second before deciding to fire the second and third shots, leaving only a total span of two seconds between when the first shot was fired and the second shot was fired.

64

The conclusion that Defendant's belief that the victim was armed with a handgun in his pocket, and intended to draw that handgun and use it, was unreasonable, is further supported by Defendant's testimony regarding his actions after the victim crawled out of the house. Defendant claimed that he wanted to help the victim, but was also keeping a close eye on him "because he was laying on his arm that he was reaching into his pocket with."[34] But it would have been extraordinarily difficult for the victim to draw a gun with his left hand and put it into use with any speed specifically as he was laying on that arm. And the Doorbell Camera shows that once Defendant exited the house, he was holding the rifle in one hand, down by his side, and paid almost no attention to the victim (in other words, he no longer viewed the victim as a threat). Instead, Defendant's attention was focused on the Guyers, to whom he was screaming the reasons he thought justified the shooting.

On the basis of the above, the evidence was more than sufficient for the jury to find that the Commonwealth had disproven Defendant's claim that his belief that deadly force was justified and necessary was unreasonable with respect to the second and third shots.

## C. *Defendant's Issue No. 3(b): Denial of Motion in Arrest of Judgement Based on Single Criminal Act Theories*

Defendant's claims here, while not the most clearly stated, proceed on two grounds. The first is that the criminal information was deficient, and did not provide him with adequate notice that the Commonwealth was proceeding against him on any theory other than that the three shots that were fired constituted a single criminal act. He claims that this deficiency violated his due process rights under PA. CONST. art. I, §§ 1, 9 and U.S. CONST. amend. XIV, and his rights to notice and opportunity to defend under PA. CONST. art. I, § 10 and U.S. CONST. amends. V, VI, XIV. The second ground is that "the three offenses as charged and adduced from the evidence at trial constituted a single criminal act, consisting of three continuous shots in rapid succession from a  semi-automatic rifle and striking

---

[34] N.T., Day Two, at 49–50.

65

Timothy Skipper," and that this Court found that only two separate offenses occurred, leading to violations of Defendants right to a jury trial under PA. CONST. art. I, § 6 and U.S. CONST. amends. V, VI, XIV.

With respect to the first ground, the Commonwealth is not required to reveal its entire theory of the case to the defendant in the criminal information.

> The purpose of an Information or an Indictment is to provide the accused with sufficient notice to prepare a defense, and to ensure that he will not be tried twice for the same act. An Indictment or an Information is sufficient if it sets forth the elements of the offense intended to be charged with sufficient detail that the defendant is apprised of what he must be prepared to meet, and may plead double jeopardy in a future prosecution based on the same set of events. **This may be accomplished through use of the words of the statute itself as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.**

Commonwealth v.Conaway, 105 A.3d 755, 764 (Pa. Super. 2014) (cleaned up; emphasis added). Thus, it is wholly sufficient if the Commonwealth mirrors and uses the language of the statute under which the offense is charged. Id. at 764–65 (criminal information was sufficient to put the appellant on notice of the offense of burglary – overnight accommodation, persons present, where the statement of the charge included each of the elements basic elements of such offense, set forth the location of the alleged offense, and gave the specific title and statutory citation of the offense, despite not specifically stating that the building was adapted for overnight accommodation or that a person was present). Here, the original criminal information filed on July 6, 2022, set forth Counts 1–3 as follows (text and emphasis as in the original):

**COUNT 1:**        **Murder of the First Degree - (H1)**
On or about:  04/03/22   **18 § 2502 §§ A**
Intentionally and with malice caused the death of another human being, namely Timothy Skipper.

**COUNT 2:**        **Aggravated Assault – Attempts to cause SBI or causes injury with extreme indifference - (F1)**
On or about:  04/03/22   **18 § 2702 §§ A1**

66

Attempted to cause serious bodily injury to another, namely Timothy Skipper, or caused such injury, intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life.

**COUNT 3:**                       **Aggravated Assault – Attempts to cause or causes BI with deadly weapon - (F2)**

On or about:    04/03/22      **18 § 2702 §§ A4**

Attempted to cause, or intentionally or knowingly did cause, bodily injury to another, namely Timothy Skipper with a deadly weapon, namely an AR15 rifle.

This is all that was required, and the criminal information therefore provided Defendant with sufficient notice of the charges against him.

Even assuming, *arguendo*, that the criminal information was deficient, Defendant's claim would not merit relief. Lack of notice in the criminal information sufficient to establish a due process violation is subject to harmless error analysis. Where the error did not actually prejudice the defendant, no relief is due. Commonwealth v. King, 660 Pa. 482, 504–511 (2020). Here, the Commonwealth was clear from the outset that one of its theories of the case on the first-degree murder charge was that Defendant could not claim self-defense because he had provoked the physical confrontation between himself and the victim. But the Commonwealth was also clear from the outset that this was not the only theory on which it was proceeding, as the Commonwealth also argued that the pause between the first shot and the second and third shots, when the physical confrontation was clearly over, showed a moment of reflection and decision by Defendant that established both the intent and premeditation necessary for first-degree murder. And the Commonwealth was clear that it was pursuing charges based on lesser-included theories, which necessarily included separate criminal acts.[35] Defendant cannot colorably claim to have lacked notice that the

---

[35] The criminal information on which Defendant was tried only presented three counts, but had been pared down significantly from the criminal information that was originally filed. The original criminal information included five other charges, as follows (numbered to match the original count numbering): (4) simple assault, attempts to cause or causes bodily injury; (5) simple assault, negligently causes bodily injury with a deadly weapon; (6) simple assault, physical menace; (7) recklessly endangering another person; and (8) terroristic threats. The amendment of the criminal information to dismiss these additional charges did not occur until

67

Commonwealth was pursuing a "multiple criminal acts" theory of the case, regardless of any deficiencies in the criminal information. Therefore no prejudice occurred, and any error was harmless.

Turning to Defendant's second ground for this issue, it appears to be based on this Court's finding, at sentencing, that two separate criminal acts occurred for purposes of merger. See N.T., Sentencing Hearing, Jan. 4, 2024, at 5 (finding that the first shot resulted in the conviction on Count 2, and the second and third shots resulted in the convictions on Counts 1 and 3). It strains not merely credulity, but reality, to claim that this Court's finding regarding merger somehow usurped Defendant's jury trial rights. This is not a case like King, where the Commonwealth filed a criminal information that asserted a base-level charge, and then sought to prosecute on a higher-graded offense. See King, 660 Pa. at 504 (the Commonwealth charged the defendant with attempted murder in the information, but actually prosecuted him for attempted murder causing serious bodily injury). Here, the jury found that multiple criminal acts occurred, based upon properly charged offenses and sufficient evidence, and further did not find Defendant guilty of the most serious offense charged (first-degree murder). Therefore, Defendant received the full benefit of his jury trial rights.

D. *Defendant's Issue No. 4: Denial of Motion for New Trial Based on the Weight of the Evidence*

While sufficiency of the evidence challenges and weight of the evidence challenges are at times conflated by appellants, they are two separate challenges, and thus the evaluation of this issue is separate from the evaluation of Defendant's Issue No. 3(a).

Weight of the evidence challenges, if successful, entitle the defendant to a new trial. Commonwealth v. Widmer, 560 Pa. 308, 318 (2000). By necessity they involve a highly subjective standard of review.

---

the morning of October 17, 2023, after jury selection had occurred and just prior to the start of trial. On this basis alone, Defendant cannot be said to have lacked notice that the Commonwealth was proceeding against him on the basis that multiple criminal acts occurred. Each of Counts 2 through 7 of the original criminal information alleged a crime that resulted in some form of injury, but not a crime that resulted in death.

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

Commonwealth v. Gonzalez, 109 A.3d 711, 723 (Pa. Super. 2015).

No deference is given to the verdict winner when evaluating the evidence, as a challenge to the weight of the evidence necessarily concedes that there is sufficient evidence to sustain the verdict. Widmer, 560 Pa. at 319 (citation omitted). The determination of whether a verdict is against the weight of the evidence ultimately invokes the trial court's discretion, and appellate review focuses on the trial court's exercise of that discretion, rather than "the underlying question of whether the verdict is against the weight of the evidence." Id. at 321 (citation omitted).

> [When reviewing a trial court's decision regarding a weight of the evidence challenge], an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.

Thompson v. City of Philadelphia, 507 Pa. 592, 599–600 (1985). The appellate court is to grant the trial court a large degree of deference regarding the trial court's determinations.

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Widmer, 560 Pa. at 321–22 (cleaned up).

69

Defendant bases his weight of the evidence claim on the following arguments: (1) the Commonwealth did not disprove his claim of self-defense as to any of the offenses; and (2) the evidence of the victim's "drug-dealing and dangerousness," including carrying firearms, showed that Defendant's actions were reasonable. These arguments are meritless.

Here, much of the testimony that supports the jury's verdicts comes from Defendant himself. At their core, his arguments do not amount to a claim that the jury should have believed his claim of self-defense, but rather that the jury should have agreed with him that the shooting was justified. However, as noted above, the jury was not required to believe Defendant's self-defense claim, and it was wholly for the jury to decide whether his stated belief was objectively reasonable. Light, 458 Pa. at 334, Jones, 273 A.3d at 458. The jury clearly determined that his belief was not objectively reasonable, and the evidence to support this determination was quite strong. No relief is warranted.

*E. Defendant's Issue No. 2: Failure to Merge Counts 1 and 2 for Sentencing*

Both the Commonwealth and Defendant submitted extensive memoranda prior to sentencing regarding the issue of merger. The Commonwealth argued that none of the offenses merged, and Defendant argued that all of the sentences merged. As noted previously, the Court's finding at sentencing was that the first shot resulted in the conviction on Count 2, and the second and third shots resulted in the convictions on Counts 1 and 3. On that basis, Count 3 merged into Count 1.

Merger is a statutory doctrine, established and controlled by 42 Pa. C.S. § 9765:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

Because merger has been created by statute (as opposed to by rule), the courts are guided by the express language of the statute in applying it. Commonwealth v. Edwards, 256 A.3d 1130, 1137 (Pa. 2021).

70

Section 9765 sets up a two-part analysis. The first addresses whether the crimes at issue resulted from a single criminal act or multiple criminal acts. The second addresses whether all of the elements of one offense are included in the elements of the other offense. If the offenses were committed in separate criminal acts, the analysis ends, as no merger can occur. See Commonwealth v. Golphin, 161 A.3d 1009, 1029 (Pa. Super. 2017) (ending the analysis without reaching the "same elements" test, because the "single act" test had not been satisfied).

> When considering whether there is a single criminal act or multiple criminal acts, the question is not whether there was a "break in the chain" of criminal activity. The issue is whether the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, [if so] then the actor will be guilty of multiple crimes which do not merge for sentencing purposes.

Id. (cleaned up).

Here, Defendant made a decision to introduce a firearm into a verbal argument, and when a physical confrontation resulted, he shot the victim in the leg. He then decided, separately, to fire two additional shots in quick succession as the victim was kneeling on the floor in front of him. These were the facts alleged by the Commonwealth in the criminal information and that were proven at trial. It is readily apparent that multiple criminal acts occurred. To hold otherwise would be to give Defendant a "volume discount" for his offenses based solely on the closeness in time of their occurrence.

## F. Defendant's Issue No. 1: Manifestly Excessive Sentence

Defendant challenges his sentences on two grounds. First, that they are manifestly excessive in that each sentence exceeds the relevant aggravated range of the Sentencing Guidelines; and second, that they are manifestly excessive in light of the criminal conduct that occurred.[36] As the same facts that justify the deviation from the Sentencing Guidelines justify the sentences generally, the Court will address the two arguments together here.

---

[36] Defendant also challenges his sentences as excessive based upon his "single criminal act" argument. As that argument has already been addressed, the Court does not analyze it here.

71

The Sentencing Guidelines are not mandatory; courts are not duty bound to impose sentences that comport with them, and "will take into account various other factors when sentencing." Commonwealth v. Archer, 722 A.2d 203, 210 (Pa. Super. 1998) (quoting Commonwealth v. Ellis, 700 A.2d 948, 958 (Pa. Super. 1997) and citing Commonwealth v. Saranchak, 544 Pa. 158, 177 n. 18 (1996) (stating that a court has no duty to impose a sentence considered appropriate under the Sentencing Guidelines)). This does not mean that sentencing courts may disregard the Sentencing Guidelines entirely, but rather only that they must be considered before the decision is made to sentence outside of them. Commonwealth v. Scassera, 965 A.2d 247, 250 (Pa. Super. 2009). Such consideration "must be more than mere fluff," as courts "must necessarily correctly apply the [Sentencing Guidelines] and reach the correct point of departure before sentencing outside [of them]." Commonwealth v. Wilson, 946 A.2d 767, 769 (Pa. Super. 2008); Archer, 722 A.2d at 210. Where a sentencing court has "adequately considered the pertinent sentencing factors" for a particular defendant (including the Sentencing Guidelines), no relief is due simply because the court "merely weighed [such factors] in a manner inconsistent with [the defendant's] desires." Commonwealth v. Dodge, 77 A.3d 1263, 1276 (Pa. Super. 2013) (citation omitted).

Where the trial court has reviewed a presentence investigation report prior to sentencing, "it is presumed that the court [was] aware of all appropriate sentencing factors and considerations, and ... its discretion should not be disturbed." Commonwealth v. Ventura, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citing Commonwealth v. Devers, 519 Pa. 88, 101–102 (1988)).

The Court was quite well-informed at sentencing with respect to the nature of Defendant's offenses, his rehabilitative needs, and his character. In addition to having presided over trial, the Court benefited from review prior to sentencing of extensive sentencing statements from both the Commonwealth and Defendant's counsel and a PSI that included lengthy written statements from Defendant, the victim's wife, the victim's two children, the victim's mother, the victim's stepfather, the victim's aunt, and the victim's mother-in-law and father-in-law. At the sentencing hearing, the Court heard statements in support of Defendant from Nora

72

Espy, a learning emotional support specialist who had worked with the Campbells in regard to their youngest daughter's autism diagnosis, and Ruth Shea, Defendant's former landlord. The Court then heard further victim impact statements from the victim's mother, the victim's wife, and the victim's two children. N.T., Sentencing Hearing, Jan. 4, 2024 ("Sentencing"), at 7–9, 13–20. The Court also heard argument from Defendant's counsel and from the Commonwealth. Id. at 10–13, 21–22.

Looking first to the Sentencing Guidelines, Defendant's prior record score was 0. On Count 1, the offense gravity score was 11, the standard range minimum sentence was 36–54 months, the low end of the mitigated range was 24 months, and the high end of the aggravated range was 66 months. The statutory maximum was 10–20 years. On Count 2, without the "deadly weapon used" enhancement, the OGS and sentencing ranges were the same as for Count 1, as was the statutory maximum. With the "deadly weapon used" enhancement, the standard range minimum sentence increased to 54–72 months and the high end of the aggravated range increased to 84 months. On Count 3, the OGS was 8, the standard range minimum sentence was 9–16 months, the low end of the mitigated range was restorative sanctions, and the high end of the aggravated range was 25 months. The statutory maximum was 5–10 years.

The sentences imposed by the Court were 10–20 years' incarceration on Count 1, plus a fine of $10,000.00 and restitution of $15,109.30, and 7–20 years' incarceration on Count 2, plus a fine of $5,000.00. The sentences run consecutively for a global sentence of 17–40 years' incarceration, and Defendant is not RRRI eligible.

The severe nature of Defendant's conduct is illustrated both by the videos and his own testimony, discussed at length above. The effect of his actions on the victim's family members is notably traumatic, both for the victim's wife, Hillary Skipper (who had to watch her husband die as she tried to save him), and for their

two children. Both children now suffer from a host of emotional issues.[37] There was also a marked effect on the broader community, expressed in the other victim impact statements, in that other people in the area are now afraid of what might happen as the result of a neighbor dispute. But what was most remarkable was Defendant's demeanor and the views he expressed regarding the shooting.

This was not a case where the defendant merely did not express remorse for his crime. Rather, not once did Defendant—despite touting that he was a family man and repeatedly stressing that his wife and children were in the house at the time of the shooting—express an iota of empathy or sympathy toward the victim's family. In his extensive written statement submitted for the PSI, Defendant not only blamed the victim for what occurred, but repeatedly made statements that made it clear that he believed that he himself was the victim. He all but plainly stated his belief that the victim deserved what happened. The Court spoke extensively about this prior to imposing sentence. Id. at 24–29. Those statements speak for themselves, but the following portions in particular bear repeating here.

> I read your statement and quite frankly I was appalled at the statement you made in the presentence investigation. You showed absolutely no remorse. Nobody's going to rehabilitate you because you don't believe you did anything wrong. You showed no remorse after you committed this crime. As a man was dying at your feet, you were standing over him screaming, holding your weapon, planning your defense, yelling at your neighbors why you had to shoot him, concocting yourself a defense story while a man laid dying at your feet. You didn't render aid. You did nothing but worry about yourself.
>
> \*\*\*
>
> The facts are clear that he did not have a gun that day when he came to your house and it's highly unlikely that he ever had a gun. So on the levels of unreasonable belief, that's why I say it's a delusional and ridiculous belief.
>
> You had posted briefly on Facebook—I think the quote was you were going to shoot the windows out of his shitty truck. You wanted to

---

[37] Id. at 18. Mrs. Skipper noted that their older son now suffers from anger issues, depression, and hopelessness, and struggles socially in school as a result of the violent loss of his father. Their younger son now suffers from depression, anxiety, and panic attacks.

intimidate that man. You wanted to be the king of the neighborhood. You wanted to show him who was the boss in that neighborhood. You ignored law enforcement and showed a total disregard for the advice that was given to you by Trooper Brenneman. You messaged him about your situation. He told you what to do if he comes on your property. He told you if he comes on your property, call the police. If you listened to him, Tim Skipper would be alive. But it's not in your nature to call 911. In fact, you have a sign hanging over the door in your kitchen that says, we do not call 911. That sign for everyone to see including your kids.

That's who you are. You don't call the police. You're going to take care of the situation. Because you didn't call the police and you judged Mr. Skipper, you became his jury, you became his judge and you ultimately became his killer.

Your actions were utterly cruel. You blow a man's leg off and as he's holding his arm up like this (indicating) trying to somehow protect himself from a [rifle],[38] you unload two more shots. The fact that you believed that you were in danger as he was lying there in agony with his leg practically blown off staring at your gun barrel pointing at him, again it's unreasonable and delusional. And it's for that reason the Sentencing Guidelines, all those reasons have been considered and I'm going to sentence in excess of the Sentencing Guidelines.

Id. at 26, 27–28.

On the basis of the above, the Court's decision to sentence outside of the Sentencing Guidelines was justified, and the sentences imposed were both reasonable and appropriate.

G. *Defendant's Issue No. 5: Admission at Trial of Photographs of the Victim's Bullet Wounds*

Defendant claims that the Court's decision to admit four photographs showing the victim's bullet wounds, Commonwealth's Exhibits 1–4, was in error because their probative value was outweighed by their unfair prejudice to Defendant, and the photographs were cumulative of other evidence admitted (specifically the autopsy report and the testimony of Dr. Kamerow).

The admission of the photographs was argued by both sides at the pretrial conference held on the day of jury selection. The Commonwealth initially sought

---

[38] The Court mistakenly referred to the weapon as a "shotgun" at sentencing.

to admit five photographs that had been selected by Dr. Kamerow to illustrate various aspects of the bullet wounds suffered by the victim, both in regard to location and severity. The Court admitted four of the photographs and excluded the fifth, as it showed a portion of the victim's face. N.T., Motions Hearing, Oct. 16, 2023, at 10–18. It was important for the jury to be able to see, as well as hear, from Dr. Kamerow what the effect of each of the bullet wounds was in order to understand what occurred and to gauge the reasonableness of the Defendant's actions and expressed beliefs (particularly with respect to the leg wound and his decision to fire two additional shots). The photographs were properly admitted.

## H. Defendant's Issue No. 6: Denial of Suppression of Evidence From the Warrantless Entry and Search of Defendant's Residence

Defendant ties this claim to the Court's denial of the suppression motion regarding this evidence set forth in his omnibus pretrial potion. The Court respectfully rests upon the reasoning and analysis set forth in the limited findings of fact and conclusions of law entered in support of the denial of Defendant's omnibus pretrial motion, filed concurrently with this opinion (the "Suppression Opinion"). The Court further notes that in addition to the testimony submitted at the hearing on Defendant's Omnibus Pretrial Motion, the evidence and testimony admitted at trial, including from Defendant himself, show that Defendant consented to the state troopers' warrantless entry into his house and securing of his firearm. He not only acquiesced to those actions, he invited them. And he willingly presented the troopers with the Kitchen video and the Doorbell Camera video. This claim is therefore meritless.

## I. Defendant's Issues Nos. 7 and 8, Denial of Suppression of Evidence Resulting from the Search Warrant Issued on April 5, 2022, at 9:53 am

Defendant ties these claims to the Court's denials of the suppression motions regarding this warrant set forth in his omnibus pretrial motion. The Court respectfully rests upon the reasoning and analysis set forth in the Suppression Opinion. The Court reiterates here that, as set forth in the Suppression Opinion, this search warrant was never served, and no evidence was obtained as a result of

76

it. As a necessary result, no evidence from such warrant was admitted at trial, and these claims of error are meritless.

*J.   Defendant's Issue No. 9: Denial of Suppression of Evidence Resulting from the Search Warrant Issued April 8, 2022, at 10:53 am*

Defendant ties this to the Court's denial of the suppression motion regarding this warrant set forth in his omnibus pretrial motion. The Court respectfully rests upon the reasoning and analysis set forth in the Suppression Opinion. The Court reiterates here that, as set forth in the Suppression Opinion, this search warrant was never served, and no evidence was obtained as a result of it. As specified at trial, this evidence, which consists of the Fence Side video and Kitchen video obtained from the Surveillance System, was obtained as a result of a separate warrant executed on the DVR router found at Defendant's residence. No evidence from the challenged warrant was admitted at trial, and this claim of error is meritless.

BY THE COURT:

George N. Zanic, President Judge

C:   David G. Smith, DA
     Thomas M. Dickey, Esq.

77